# IN RE PETITION OF MICHELLE GIBLIN TO RELEASE PATRICK SHAWN GIBLIN AND OTHERS.

232 N. W. 2d 214.

July 18, 1975—No. 45274.

*James W. Hoolihan,* for petitioner.

*James P. Cullen, Melvin B. Goldberg, Thomas G. Rowe, Mary Wahlstrand,* and *Cort C. Holten,* Legal Assistance to Minnesota Prisoners, for respondent.

KELLY, JUSTICE.

Petition for writ of prohibition commanding the Stearns County District Court to refrain from continuing, enforcing, or invoking any present or further equitable relief in favor of respondent, Michelle Giblin, divorced mother of the children whose custody is contested, and against petitioner, Paul Giblin, the divorced father, who was awarded temporary custody by an Illinois circuit court order.

The gist of the problem is this: A Minnesota court has acted, and continues to act through its injunctive order, and proposes to act further, so as to render ineffective an outstanding order of another state's tribunal. We are asked to consider what effect the courts of this state should give to the foreign custody order. The lower court, in a proceeding initiated by respondent to obtain the children's custody through a writ of habeas corpus and to obtain an injunction to prevent petitioner from removing them from this state and from her control, determined that the State of Illinois lacked jurisdiction to affect custody and that Minnesota was in no way bound by Illinois' improper assertion of power. We issued an alternative writ of prohibition commanding the district court to refrain from further proceedings until the further order of this court. For reasons appearing below, the alternative writ is discharged.

Petitioner and respondent are the natural parents of Patrick Shawn, age 10, Paul Kelley, age 7, and Shannon Lee, age 5. The parents were married in Illinois May 29, 1962, and divorced there on September 10, 1971. Custody originally was awarded to respondent; petitioner received substantial visitation rights. The divorce court found both parents to be fit and proper.[1]

In March 1972, the 1971 decree was modified by an Illinois court to permit respondent to take the children out of Illinois to

---

[1] We are hampered in our review by the absence of an evidentiary hearing below. The matter was submitted on argument and affidavits. The facts as set forth herein are stated for purposes of this opinion only.

Minnesota for an indefinite period of time. Petitioner opposed the modification and sought a change of custody. Although unsuccessful, petitioner was granted extensive visitation rights, to wit: Once every 2 months in Minnesota, the last 2 weeks of July and the first 4 weeks of August each summer in Illinois, and during Christmas recess in Illinois. Respondent was required to bring the children to Illinois and petitioner, to return them to Minnesota.

Respondent, who without contest claims a Minnesota domicile, has resided continuously in Stearns County since March 1972 and the children have been enrolled in various public schools in that area. Their maternal grandparents also live in Stearns County.

On May 3, 1974, respondent entered a guilty plea in Stearns County District Court to wrongfully obtaining public assistance. The court sentenced her to the commissioner of corrections for a term of 0 to 5 years and recommended that she be placed in the property offender program at the Correctional Institution for Women in Shakopee. Confinement began on May 6; she was paroled July 29, two weeks after the Stearns County habeas corpus and injunction proceedings. At the time of those proceedings, respondent's release date was unknown.

On or about the date of respondent's sentencing, she requested that petitioner come to Minnesota to take all the children back to Illinois. By May 23, petitioner had done so. Respondent asserts, however, that petitioner agreed he would exercise his 6-week visitation rights as soon as possible and that petitioner came to Minnesota for that purpose only. Furthermore, respondent alleges that petitioner was to return the children to her control by June 13, which he did not do. Respondent demanded their return on June 18. Petitioner contends, on the contrary, that respondent asked petitioner to pick up the oldest child on May 3 and the other children on May 23. He was to keep them in Illinois for the indefinite term of her prison confinement. The

trial court made no findings resolving the conflicting claims on this issue.

With the children under his control in Illinois, on June 19, petitioner sought relief from the terms of the extant Illinois custody provisions by petitioning the Circuit Court for DuPage County, Illinois, for modification of those terms. Respondent received notice of the Illinois hearing and appeared there on July 1. The exact nature and legal consequences of the Illinois hearing and the circumstances attending it are also matters of dispute.

Respondent and her Illinois counsel stipulated to the provisions of an order, issued by the Illinois court on July 1, which essentially granted temporary custody to petitioner; additionally, respondent made a general appearance without contesting the Illinois court's power to act.

Among other things, the July 1 order provided that the children remain with petitioner in Illinois until further order of that court. With respect to the ultimate custody of the children, the court's order makes apparent the Illinois court's concern about respondent's incarceration and her activities preceding it. The court ordered that a copy of the presentence investigation report relating to respondent be furnished and also ordered an investigation of the father for the express purpose of aiding the court in determining the question of custody. A final hearing was set for August 12.

The order allowed petitioner to take the children to Minnesota for a vacation from July 10 to 22. Respondent was granted visitation privileges from 9 a.m. July 11 to 6 p.m. July 12.[2] Petitioner

---

[2] The Illinois court's order is as follows: "THIS MATTER COMING ON TO BE HEARD on the Petition of PAUL GIBLIN, Counter-Plaintiff, for the entry of an Order modifying the custody provisions of the Decree heretofore entered and modified, and the parties being present in Court and each party being represented by Counsel, and on Motion of PAUL GIBLIN to allow John Demling to substitute as his attorney in this cause, and the Court having heard statements of Counsel for the parties in open Court, and the provisions of this Order being stipulated to by each of the par-

complied with the Illinois order, leaving the children with respondent at the Shakopee Women's Prison and apparently agreeing to pick them up at 6 p. m. the next day at respondent's parents' home in Sartell.

On July 10, however, and proceeding in forma pauperis, respondent instituted the habeas corpus and injunction proceeding in the Stearns County District Court, and also sought a temporary restraining order. Judge Charles Kennedy restrained petitioner from removing the children from Stearns County or from

---

ties in open Court, and the Court being fully advised in the premises,

"It Is Ordered That:

"A.   John Demling be substituted as Attorney for Paul Giblin in the within cause.

"B.   Respondent Michele Giblin be given twenty days to answer to the Petition.

"C.   The three minor children of the parties remain with Paul Giblin in the State of Illinois until further Order of this Court, except that during the period July 10, 1974 through July 22, 1974 said children may be removed to Minnesota for the purpose of a vacation, during which period the Respondent Michele Giblin shall have visitation with said children from 9:00 A.M. on July 11, 1974 until 6:00 P.M. on July 12, 1974.

"D.   A copy of the confidential presentencing investigation made by Sam Knutson, Agent of the Minnesota Department of Correction, relating to Respondent Michele Giblin in the Case of State of Minnesota vs. Michele Giblin, in the District Court, Seventh Judicial District, State of Minnesota, County of Stearns before the Honorable Paul Hoffman, Judge of said Court, presented to said Court on or about May 3, 1974, be sent to the undersigned Judge of this Court.

"E.   That a copy of the report, or reports of the Stearns County Welfare Department, State of Minnesota, relating to Respondent Michele Giblin be sent to the undersigned Judge of this Court.

"F.   That the DuPage County Probation Department undertake an investigation of the Petitioner Paul Giblin, for the purpose of aiding this Court in determining the question of custody of the three minor children of the parties as it relates to the health and welfare of the said children.

"G.   That final hearing on this cause be and it is set for August 12, 1974 at 2:00 P.M."

respondent's control, from harassing or intimidating respondent or her children, friends, or relatives, or from otherwise interfering with respondent's care, control, or custody of the children. When petitioner appeared in Sartell at the appointed hour, he was served with the restraining order, the petition for a writ of habeas corpus and injunctive relief, and the writ.

On July 13, petitioner responded before Judge Paul Hoffman by moving to quash and by petitioning for his own writ of habeas corpus. Oral argument was heard on July 17, at which time Judge Hoffman in substance directed that the temporary restraining order be made a temporary injunction. Without taking testimony and proceeding only on affidavits, the trial court determined that the Illinois court had lacked jurisdiction to affect the custody of the Giblin children and that Minnesota had such jurisdiction. In effect, custody was left in respondent or her agents with limited visitation privileges, since expired, in petitioner. The trial court specifically did not pass on the fitness of either parent. The habeas corpus proceedings were terminated.

On July 30, petitioner sought a writ of prohibition from this court. On July 29, respondent was paroled to her Stearns County residence where she now resides with the children. Subsequent proceedings in Illinois, at which respondent did not appear, resulted in a court order issued in August 1974 granting petitioner permanent custody of the children. On September 26, 1974, our alternative writ issued.

These issues are presented: (1) Whether a petition for writ of prohibition is an appropriate procedural device by which to seek appellate consideration of the main issue raised; (2) whether the lower court failed to give proper effect to the order of the Illinois trial court and by so doing, overstepped and abused its powers; (3) whether the lower court exceeded its authority by failing to require that respondent furnish security prior to receiving equitable relief when respondent was proceeding in forma pauperis.

■ It is clear that a petition for a writ of prohibition is a

proper procedural vehicle to present questions relating to jurisdiction.[3] In this case, the district court had jurisdiction; thus, the crux of the problem is, whether, having that jurisdiction, the trial court exceeded the bounds of its proper exercise or otherwise abused it by not giving effect to the foreign custody order.[4]

■ We are not here prepared to say whether the trial court took a correct view of the Illinois order of July 1. Instead, we prefer to remand the question of jurisdiction to the district court for treatment in light of the principles hereinafter enunciated. If that court concludes under the guidelines of this opinion that it need not give effect to the Illinois court order and it is asked to determine which parent should have custody, the district court then should make that difficult decision by using the rules commonly applied in resolving that question.[5]

---

[3] See, Wasmund v. Nunamaker, 277 Minn. 52, 151 N. W. 2d 577 (1967); Thermorama, Inc. v. Shiller, 271 Minn. 79, 135 N. W. 2d 43 (1965); Griggs, Cooper & Co. v. Lauer's, Inc. 264 Minn. 338, 119 N. W. 2d 850 (1962); Smith v. Tuman, 262 Minn. 149, 114 N. W. 2d 73 (1962); State v. Hartman, 261 Minn. 314, 112 N. W. 2d 340 (1961); Mariner v. Whipple, 259 Minn. 18, 104 N. W. 2d 657 (1960); Bellows v. Ericson, 233 Minn. 320, 40 N. W. 2d 654 (1951); Kienlen v. Kienlen, 227 Minn. 137, 34 N. W. 2d 351 (1948); Huhn v. Foley Bros. Inc. 221 Minn. 279, 22 N. W. 2d 3 (1946); State ex rel. Minnesota Nat. Bank v. District Court, 195 Minn. 169, 262 N. W. 155 (1935).

A distinction is to be drawn between the propriety of using a petition for writ of prohibition in order to raise the issue of power, or the extent and use of it, and the propriety of granting the writ, an act within the discretion of the appellate court. When exercising its discretion, however, this court must adhere to the law governing a subject.

[4] If the lower court committed substantive errors of law in exceeding or abusing its powers, the writ of prohibition normally should not correct them, save in so far as is necessary to determine whether there is an excess or abuse. Often, preventing excess or abuse also has the effect of correcting errors of substance. As a general rule, the writ is one only of appellate prevention, not appellate correction.

[5] We are aware that the only matter presently before the lower court is an injunctive proceeding. To facilitate disposition and in light of our holding today, we would urge that if the trial court determines that it

We are struck by the disparity of treatment accorded these interstate custody disputes by the various jurisdictions. Even within one jurisdiction, the results are often confused and conflicting. Although the situation literally cries for attention, the United States Supreme Court has not chosen to provide definitive guidelines.[6] The Commissioners' Prefatory Note to the Uniform Child Custody Jurisdiction Act, 9 U. L. A. p. 99, describes the problem:

will not give effect to the Illinois court's order, the parties squarely submit all procedural and substantive issues to the trial court so that they can be fully decided as promptly as possible.

Although prohibition might otherwise be again appropriate if either of the parties is disappointed in the trial court's subsequent decision on jurisdictional issues, this court would be reluctant to consider jurisdictional issues again before disposition on the merits by the trial court if that court determines it should exercise jurisdiction.

[6] See, Ford v. Ford, 371 U. S. 187, 83 S. Ct. 273, 9 L. ed. 2d 240 (1962); Kovacs v. Brewer, 356 U. S. 604, 78 S. Ct. 963, 2 L. ed. 2d 1008 (1958); May v. Anderson, 345 U. S. 528, 73 S. Ct. 840, 97 L. ed. 1221 (1953); State of New York ex rel. Halvey v. Halvey, 330 U. S. 610, 67 S. Ct. 903, 91 L. ed. 1133 (1947).

Generally on this subject, including proposals similar to the one we favor today, see Note, *Children in Transit: Child Custody and the Conflict of Laws,* 6 U. of Cal., Davis L. Rev. 160; Comment, 12 Loyola L. Rev. 147; Comment, 7 Duquesne L. Rev. 262; Ehrenzweig, *The Interstate Child and Uniform Legislation: A Plea for Extralitigious Proceedings,* 64 Mich. L. Rev. 1; Ehrenzweig, Conflict of Laws, p. 281; Ehrenzweig, *Interstate Recognition of Custody Decrees,* 51 Mich. L. Rev. 345; Ratner, *Child Custody in a Federal System,* 62 Mich. L. Rev. 795; Currie, *Full Faith and Credit, Chiefly Judgments: A Role for Congress,* 1964 Sup. Ct. Rev. 89; Ratner, *Legislative Resolution of the Interstate Child Custody Problem: A Reply to Professor Currie and a Proposed Uniform Act,* 38 So. Cal. L. Rev. 183; Hazard, *May v. Anderson: Preamble to Family Law Chaos,* 45 Va. L. Rev. 379; Bodenheimer, *The Uniform Child Custody Jurisdiction Act: A Legislative Remedy for Children Caught in the Conflict of Laws,* 22 Vanderbilt L. Rev. 1207; Leflar, American Conflicts Law, § 246; Restatement, Conflict of Laws 2d, § 79.

"There is growing public concern over the fact that thousands of children are shifted from state to state and from one family to another every year while their parents or other persons battle over their custody in the courts of several states. Children of separated parents may live with their mother, for example, but one day the father snatches them and brings them to another state where he petitions a court to award him custody while the mother starts custody proceedings in her state; or in the case of illness of the mother the children may be cared for by grandparents in a third state, and all three parties may fight over the right to keep the children in several states. These and many similar situations constantly arise in our mobile society where family members often are scattered all over the United States and at times over other countries. A young child may have been moved to another state repeatedly before the case goes to court. When a decree has been rendered awarding custody to one of the parties, this is by no means the end of the child's migrations. It is well known that those who lose a court battle over custody are often unwilling to accept the judgment of the court. They will remove the child in an unguarded moment or fail to return him after a visit and will seek their luck in the court of a distant state where they hope to find—and often do find—a more sympathetic ear for their plea for custody. The party deprived of the child may then resort to similar tactics to recover the child and this 'game' may continue for years, with the child thrown back and forth from state to state, never coming to rest in one single home and in one community.

"The harm done to children by these experiences can hardly be overestimated. It does not require an expert in the behavioral sciences to know that a child, especially during his early years and the years of growth, needs security and stability of environment and a continuity of affection. A child who has never been given the chance to develop a sense of belonging and whose personal attachments when beginning to form are cruelly disrupted,

may well be crippled for life, to his own lasting detriment and the detriment of society.

"This unfortunate state of affairs has been aided and facilitated rather than discouraged by the law. There is no statutory law in this area and the judicial law is so unsettled that it seems to offer nothing but a 'quicksand foundation' to stand on. See Leflar, American Conflicts Law 585 (1968). See also Clark, Domestic Relations 320 (1968). There is no certainty as to which state has jurisdiction when persons seeking custody of a child approach the courts of several states simultaneously or successively. There is no certainty as to whether a custody decree rendered in one state is entitled to recognition and enforcement in another; nor as to when one state may alter a custody decree of a sister state.

"The judicial trend has been toward permitting custody claimants to sue in the courts of almost any state, no matter how fleeting the contact of the child and family was with the particular state, with little regard to any conflict of law rules. See Leflar, American Conflicts Law 585-6 (1968) and Leflar, 1967 Annual Survey of American Law, Conflict of Laws 26 (1968). Also, since the United States Supreme Court has never settled the question whether the full faith and credit clause of the Constitution applies to custody decrees, many states have felt free to modify custody decrees of sister states almost at random although the theory usually is that there has been a change of circumstances requiring a custody award to a different person. Compare People ex rel. Halvey v. Halvey, 330 U. S. 610, 67 S. Ct. 903, 91 L. Ed. 1133 (1947); and see Comment, Ford v. Ford: Full Faith and Credit To Child Custody Decrees? 73 Yale L. J. 134 (1963). Generally speaking, there has been a tendency to over-emphasize the need for fluidity and modifiability of custody decrees at the expense of the equal (if not greater) need, from the standpoint of the child, for stability of custody decisions once made. Compare Clark, Domestic Relations 326 (1968).

"Under this state of the law the courts of the various states

have acted in isolation and at times in competition with each other; often with disastrous consequences. A court of one state may have awarded custody to the mother while another state decreed simultaneously that the child must go to the father. See Stout v. Pate, 209 Ga. 786, 75 S. E. 2d 748 (1953) and Stout v. Pate, 120 Cal. App. 2d 699, 261 P. 2d 788 (1953), cert. denied in both cases 347 U. S. 968, 74 S. Ct. 744, 776, 98 L. Ed. 1109, 1110 (1954); Moniz v. Moniz, 142 Cal. App. 2d 527, 298 P. 2d 710 (1956); and Sharpe v. Sharpe, 77 Ill. App. 2d 295, 222 N. E. 2d 340 (1966). In situations like this the litigants do not know which court to obey. They may face punishment for contempt of court and perhaps criminal charges for child stealing in one state when complying with the decree of the other. Also, a custody decree made in one state one year is often overturned in another jurisdiction the next year or some years later and the child is handed over to another family, to be repeated as long as the feud continues. See Com. ex rel. Thomas v. Gillard, 203 Pa. Super. 95, 198 A. 2d 377 (1964) ; In Re Guardianship of Rodgers, 100 Ariz. 269, 413 P. 2d 774 (1966); Berlin v. Berlin, 239 Md. 52, 210 A. 2d 380 (1965) ; Berlin v. Berlin, 21 N. Y. 2d 371, 235 N. E. 2d 109 (1967), cert. denied [393 U. S. 840, 89 S. Ct. 118, 21 L. Ed. 2d 111] (1968) ; and Batchelor v. Fulcher, 415 S. W. 2d 828 (Ky. 1967).

"In this confused legal situation the person who has possession of the child has an enormous tactical advantage. Physical presence of the child opens the doors of many courts to the petitions and often assures him of a decision in his favor. It is not surprising then that custody claimants tend to take the law into their own hands, that they resort to self-help in the form of child stealing, kidnapping, or various other schemes to gain possession of the child. The irony is that persons who are good, law-abiding citizens are often driven into these tactics against their inclinations; and that lawyers who are reluctant to advise the use of

maneuver of doubtful legality may place their clients at a decided disadvantage."

See Wheeler v. District Court, 526 P. 2d 658, 660 (Colo. 1974), also involving an Illinois court, and a situation not unlike the one before us, where, the court characterized the act as designed "to eliminate jursidictional fishing with children as bait."

Although this court has been long aware of the problems just outlined, those who are compelled or choose to enter our courts in such custody disputes receive little aid from our decisions in anticipating the outcome of their litigation.[7] If a decision has already been reached in another jurisdiction which has determined that it has power to act,[8] our cases have at times failed to give due consideration to the propriety of refusing to recognize that decision and instead reaching a contrary result.

In deciding the matter before us, we do not utilize our prior decisions on the subject. And, in effect, we do not decide the questions of jurisdiction put squarely before us. What we do is to hold that the principles and the appropriate provisions of the Uniform

---

[7] It would serve no useful purpose to attempt to reconcile what we have said in our numerous sorties into the subject of interstate child custody. In view of the result we reach today, we merely refer the interested reader to certain of our cases. See, e.g., Ray v. Ray, 299 Minn. 192, 217 N. W. 2d 492 (1974); In re Petition of Barker v. Barker, 286 Minn. 314, 176 N. W. 99 (1970); In re Welfare of Longseth, 282 Minn. 28, 162 N. W. 2d 365 (1968); Hughes v. Hughes, 276 Minn. 380, 150 N. W. 2d 572 (1967); Willmore v. Willmore, 273 Minn. 537, 143 N. W. 2d 630, certiorari denied, 385 U. S. 898, 87 S. Ct. 202, 17 L. ed. 2d 130 (1966); State ex rel. Glasier v. Glasier, 272 Minn. 62, 137 N. W. 2d 549 (1965); Zaine v. Zaine, 265 Minn. 105, 120 N. W. 2d 324 (1963); State ex rel. Jaroszewski v. Prestidge, 249 Minn. 80, 81 N. W. 2d 705 (1957); MacWhinney v. MacWhinney, 248 Minn. 303, 79 N. W. 2d 683 (1956); In re Adoption of Pratt, 219 Minn. 414, 18 N. W. 2d 147 (1945); State ex rel. Larson v. Larson, 190 Minn. 489, 252 N. W. 329 (1934); State ex rel. Aldridge v. Aldridge, 163 Minn. 435, 204 N. W. 326 (1925).

[8] See, e.g., Crawley v. Bauchens, 13 Ill. App. 3d 791, 300 N. E. 2d 603 (1973); Sharpe v. Sharpe, 77 Ill. App. 2d 295, 222 N. E. 2d 340 (1966).

Child Custody Jurisdiction Act should be applied to this case.[9] To the extent that our precedents differ or are inconsistent with the Uniform Act, for the purposes of this case we direct the trial court to disregard them in arriving at an ultimate decision.

---

[9] We again direct attention to the prefatory note to the Uniform Act: "To remedy this intolerable state of affairs where self-help and the rule of 'seize-and-run' prevail rather than the orderly processes of the law, uniform legislation has been urged in recent years to bring about a fair measure of interstate stability in custody awards. See Ratner, Child Custody in a Federal System, 62 Mich. L. Rev. 795 (1964); Ratner, Legislative Resolution of the Interstate Child Custody Problem: A reply to Professor Currie and a Proposed Uniform Act, 38 S. Cal. L. Rev. 183 (1965); and Ehrenzweig, The Interstate Child and Uniform Legislation: A Plea for Extra-Litigious Proceedings, 64 Mich. L. Rev. 1 (1965). In drafting this Act, the National Conference of Commissioners has drawn heavily on the work of these authors and has consulted with other leading authorities in the field. The American Bar Association has taken an active part in furthering the project.

"The Act is designed to bring some semblance of order into the existing chaos. It limits custody jurisdiction to the state where the child has his home or where there are other strong contacts with the child and his family. See Section 3. It provides for the recognition and enforcement of out-of-state custody decrees in many instances. See Sections 13 and 15. Jurisdiction to modify decrees of other states is limited by giving a jurisdictional preference to the prior court under certain conditions. See Section 14. Access to a court may be denied to petitioners who have engaged in child snatching or similar practices. See Section 8. Also, the Act opens up direct lines of communication between courts of different states to prevent jurisdictional conflict and bring about interstate judicial assistance in custody cases.

"The Act stresses the importance of the personal appearance before the court of non-residents who claim custody, and of the child himself, and provides for the payment of travel expenses for this purpose. See Section 11. Further provisions insure that the judge receives necessary out-of-state information with the assistance of courts in other states. See Sections 17 through 22.

"Underlying the entire Act is the idea that to avoid the jurisdictional conflicts and confusions which have done serious harm to innumerable children, a court in one state must assume major responsibility to determine who is to have custody of a particular child; that this court must

We regard the Uniform Child Custody Jurisdiction Act as an authoritative statement of the rules currently to be preferred in dealing with the problems encountered in the instant case. Several states have adopted in whole or in part this uniform act,[10] and we commend it to the legislature for adoption with such modification as its policy decisions may dictate.

We do not intend to intimate by this opinion that the Illinois court's recent orders in this matter should or should not be recognized and given effect by the trial court. The case is remanded so that the trial court may determine that issue based upon findings of fact arrived at after a full evidentiary hearing and by applying the principles and rules enunciated in the uniform act. If it is decided that the recent orders of the Illinois court are to be given effect, then the injunction should be dissolved and the children's custody granted to petitioner. Otherwise, the court may continue the injunction at least until such time as the custody issue has been decided by it.

■ The argument is also made that the lower court acted im-

---

reach out for the help of courts in other states in order to arrive at a fully informed judgment which transcends state lines and considers all claimants, residents and, nonresidents, on an equal basis and from the standpoint of the welfare of the child. If this can be achieved, it will be less important *which* court exercises jurisdiction but that courts of the several states involved act in partnership to bring about the best possible solution for a child's future.

"The Act is not a reciprocal law. It can be put into full operation by each individual state regardless of enactment of other states. But its full benefits will not be reaped until a large number of states have enacted it, and until the courts, perhaps aided by regional or national conferences, have come to develop a new, truly 'inter-state' approach to child custody litigation. The general policies of the Act and some of its specific provisions apply to international custody cases." 9 U. L. A. p. 101.

[10] These states have enacted the Uniform Child Custody Jurisdiction Act: California, Colorado, Hawaii, North Dakota, Oregon, and Wyoming. The act was approved by the National Conference of Commissioners on Uniform State Laws and the American Bar Association in 1968.

properly in failing to require respondent to furnish security. Rule 65.03(1), Rules of Civil Procedure. We disagree.

The bond required by the rule and formerly required by statute is said to be jurisdictional. Bellows v. Ericson, 233 Minn. 320, 40 N. W. 2d 654 (1951). See, also, Independent School Dist. No. 35 v. Oliver Iron Min. Co. 169 Minn. 15, 208 N. W. 952, 210 N. W. 856 (1926); 3 Hetland & Adamson, Minnesota Practice, Civil Rules Ann. p. 157. Cf. Northwest Hotel Corp. v. Henderson, 257 Minn. 87, 100 N. W. 2d 493 (1959); Craigmile v. Sorenson, 241 Minn. 222, 62 N. W. 2d 846 (1954). The first-cited cases, of course, antedate our adoption of the rule. We believe that, in most instances, good and easily recognizable reasons remain for adhering to our earlier statements.

Rule 65.03(1) requires security only "in such sum as the court deems proper," while Minn. St. 1971, § 585.04, a statute in effect when the district court granted respondent the temporary injunction, provided in pertinent part:

"When not otherwise especially provided by law, the applicant for the writ, before the same issues, shall give a bond in the penal sum of at least $250, * * *."[11]

However, Rule 65 superseded this statute to the extent it was inconsistent with the rule, and the quoted language of Rule 65.03(1) plainly gives the trial judge wide discretion in setting the amount of a bond. Under the circumstances of this injunction proceeding, which is truly no more nor less than a proceeding to determine which parent should have present custody, we hold that the trial judge properly exercised his discretion in deciding to require no bond at all.

Rule 24, Code of Rules for the District Courts, reads:

"Before any restraining order shall be issued, except in aid of writs of execution or replevin, or in actions for divorce, the applicant shall give a bond in the penal sum of at least $1,-000, * * *."

---

[11] Repealed by L. 1974, c. 394, § 11.

Minn. St. 480.055, subd. 1, enables the district bench to adopt this rule. That statute provides:

"Any court, other than the supreme court, may adopt rules of court governing its practice; the judges of district courts, pursuant to Minnesota Statutes, Sections 484.52, 484.33 * * * may adopt rules not in conflict with the rules promulgated by the supreme court."

Rule 65.03(1), a rule adopted by this court and thus controlling when rules adopted by the district courts are inconsistent with it, permits our district courts to require the giving of security in any sum thought to be proper. Rule 24 of the Code of Rules, which requires a minimal bond in most cases of $1,000, imposes a requirement which under most circumstances is not in conflict with our rule. Since our rule supersedes Rule 24 where inconsistencies exist, our determination that under the circumstances of this case the district court could properly require no bond under Rule 65.03(1), Rules of Civil Procedure, governs. Moreover, Minn. St. 484.33 permits the individual judges of the district bench to relax or modify rules adopted by that bench or to relieve a party from their effect "in furtherance of justice * * * on such terms as may be just."[12] We perceive nothing here to require us to undermine the actions of the district court.

It might be argued also that Rule 24 itself permitted the district court to require no security because this proceeding falls within the ambit of "actions for divorce."[13] We prefer to base our decision on the ground that, in appreciation of the facts as

---

[12] Minn. St. 484.33 provides in part: "The judges of the district court shall assemble annually * * * to revise the general rules of practice in such courts * * *. [They] may revise and amend such rules as they deem expedient, conformably to law * * *. Such rules * * * shall govern all the district courts of the state; but, in furtherance of justice, they may be relaxed or modified in any case, or a party relieved from the effect thereof, on such terms as may be just * * *."

[13] But cf., e.g., Anderson v. Anderson, 260 Minn. 226, 109 N. W. 2d 571 (1961).

he saw them, the district judge was justified in not requiring security. We will not often permit injunctive proceedings to continue without the protection of a bond, and when the cases arise, instead will closely scrutinize the circumstances to assure ourselves that the right choice has been made. But in this type of action with this type of plaintiff, the trial judge did not abuse his discretion and we do not prohibit further proceedings.[14]

The alternative writ is discharged and this matter is remanded for further proceedings consistent with this opinion.

SCOTT, JUSTICE (dissenting).

The majority opinion relies upon the Uniform Child Custody Jurisdiction Act in remanding the question of jurisdiction to the district court. While this reliance is wholly proper, it does not necessitate remanding the matter to the district court. I must dissent and would make the alternative writ of prohibition absolute.

The prefatory note to the Uniform Act specifically states that its purpose is to use the "orderly processes of the law * * * to bring about a fair measure of interstate stability in custody awards."[1] The record before us indicates that petitioner sought in the Illinois court modification of extant Illinois custody provi-

---

[14] It would appear that, as a rule, in cases where a decision must be made in the best interests and welfare of children, no bond should be required.

Here, we detect possible constitutional defects should a bond be required. See Mr. Justice Black's dissent to the denial of certiorari in Meltzer v. C. Buck LeCraw & Co. 402 U. S. 954, 91 S. Ct. 1624, 29 L. ed. 2d 124 (1971); Boddie v. Connecticut, 401 U. S. 371, 91 S. Ct. 780, 28 L. ed. 2d 113 (1971). See, also, Chief Judge Devitt's opinion in Lamb v. Hamblin, 57 F.R.D. 58 (D. Minn. 1972). Cf. United States v. Kras, 404 U. S. 434, 93 S. Ct. 631, 34 L. ed. 2d 626 (1973). Kras and Boddie, however, suggest reasons why decision might not be made to turn on this point alone in this case. We do not foreclose future consideration of such difficulties in cases similar to this one, or in others which place the issue before us.

[1] 9 U. L. A. pp. 99, 101.

sions, which had been included in the divorce decree entered September 10, 1971, and modified by the March 1972 order permitting respondent to remove the children to Minnesota. The children were present in Illinois at this time pursuant to an agreement.

The respondent and her Illinois counsel stipulated to the Ilinois court's order of July 1, 1974, which essentially granted temporary custody to the petitioner. Further, by way of general appearance, the respondent submitted to and did not challenge the power of the Illinois court to exercise custody jurisdiction. A final hearing was scheduled for August 12, 1974, following investigations ordered by the court to aid the court in ultimately determining the custody question. Subsequent proceedings in the Illinois court resulted in the August 1974 order which placed permanent custody in the petitioner.

There have been no challenges here to the adequacy, fairness, or competence of the Illinois court in its conduct of the custody hearings. Rather, all challenges are couched in terms of the lack of jurisdiction. In accordance with the stated purpose of the Uniform Act, and in view also of the general appearance of respondent and her failure to raise the jurisdictional question before the Illinois court, I would order that the alternative writ of prohibition be made absolute upon the basis that this court as a matter of comity will recognize the order of the court of a sister state which has undertaken to act in determining custody. Such a decision would be consistent with the general purpose of serving the best interests of the children, would avoid duplicitous actions in an interstate custody dispute, and would lend credence to our oft-stated humane purpose in this field of seemingly neverending litigation.