**ROSEWOOD MORTGAGE
CORPORATION,
Respondent,**

v.

**Thomas E. HEFTY and Metco
Mortgage Corporation,
Appellants.**

**No. C3–85–1744.**

Court of Appeals of Minnesota.

March 18, 1986.

Robert L. Schnell, Jr., Faegre & Benson, Minneapolis, for respondent.

Eric J. Magnuson, Rider, Bennett, Egan & Arundel, Minneapolis, for appellants.

Heard, considered and decided by FORSBERG, P.J., and LANSING and RANDALL, JJ.

## OPINION

RANDALL, Judge.

This appeal is from an order granting a temporary injunction against appellants Thomas Hefty and his company, Metco Mortgage. The injunction enforces a restrictive covenant in Hefty's employment contract with respondent Rosewood Mortgage. It prohibits Hefty and Metco from doing business with five institutions which Hefty dealt with while at Rosewood. We reverse.

## FACTS

Appellant Thomas Hefty joined respondent Rosewood in October of 1981 to establish a mortgage banking operation for the parent Rosewood Corporation. Hefty at that time had over ten years' experience in the real estate field, and four years in mortgage banking. Mortgage banking involves not only the financing of real estate purchases but the selling of mortgages on the "secondary market" to larger institutions, as well as other investors.

Hefty was not extensively involved in the initiation of mortgages through local realtors. Rosewood hired loan officers who, through contacts with realtors, sold the corporation's lending services to real estate purchasers. Hefty made a number of visits to real estate offices, accompanied by a Rosewood loan officer, to promote the company name.

Hefty's primary responsibility at Rosewood was dealing with government agencies and buyers in the secondary market. In order to deal in government-backed mortgages, appropriate agency approval was required, both of the company and the individual "underwriter." Hefty brought individual HUD and FNMA (Fannie Mae) approval with him to Rosewood, and obtained company approval.

The only evidence in the record as to characteristics of the secondary market is the deposition of Hefty.

Hefty described a secondary market dominated by large institutional buyers, such as the five named in the injunction. Thus, although Rosewood had a list of 70 investors, most sales were to large institutions. Although personal contacts might ensure consideration of a company's mortgages, pricing appears to have been the predominant factor in sales.

Hefty described his approach to this market generally as follows:

Q Who are you working with on the secondary market?

 * * * * * *

A Would you define for me who I'm working with? We could be here all night. There are mortgage bankers, S & L's brokers, dealers, who?

Q I guess I mean all of that and more. Do you have any lists or something that I could get a copy of, rather than asking you to remember all those folks?

A I can give you a copy of the mortgage bankers magazine.

Q I doubt you call everyone in the magazine.

A I call around for prices all the time.

Q Is there any list that you have, phone numbers or buyers of mortgages or anything like that, that you work from?

A No, sir.

Q How do you decide who to call?

A I have a telerate in front of me. That is a compilation, if you would, of today's street prices on Wall Street. And I can pickup [sic] some people I know in the industry and give them a holler.

Rosewood would negotiate commitments from these institutions to purchase mortgages, while its loans were still in process for approval and closing. Hefty did not consider such institutions, even those with which a "contact" had been established, to be "clients."

When Hefty was hired, he signed an employment agreement which included the following restrictive covenant:

Non-Competition: In the event Hefty leaves the employment of [Rosewood], Hefty agrees not to service any clients established through [Rosewood] during the period of his employment, for a period of two (2) years from said date of termination.

In 1983, Hefty signed a new contract with a salary increase, and better incentives. The 1983 agreement included a more restrictive non-competition clause:

Non-competition: In the event of termination of employment of Hefty, Hefty agrees not to service or transact business with any clients or institutions [with] whom Hefty had contact while with [Rosewood] during the period of his employment, for a period of two (2) years from said date of termination.

Hefty resigned from Rosewood in January 1985. The assistant vice-president under him, Jim Gillquist, resigned effective the same day. Hefty, Gillquist, and a third investor formed Metco Mortgage, which eventually hired five former Rosewood employees.

Rosewood brought this action for injunctive relief and damages in April, 1985. Discovery was delayed, in part, by health problems experienced by Hefty's counsel. A motion for a temporary injunction was set for hearing on August 20. Hefty's counsel requested, and was granted, a continuance of the hearing to the following week. Because of what Hefty's counsel considered

evasive and non-responsive discovery answers, he prepared a motion to compel discovery and to continue the hearing. The trial court refused to consider these motions, or affidavits submitted in opposition to the motion for a temporary injunction, because they were not filed seven days before the hearing date. Special Rules of the Second Judicial District 8(g)(2). The motion papers were not *served* seven days before the hearing either.

## ISSUES

1. Did the trial court abuse its discretion in refusing to consider the affidavits submitted by appellant?

2. Did the trial court err in granting the temporary injunction?

## ANALYSIS

### I.

*Exclusion of untimely affidavits*

■ Special Rule 8(g)(2) of the Second Judicial District requires a party opposing a motion to serve and file responsive papers at least seven days before the hearing.

The trial court had discretion to enforce this local rule of practice by refusing to consider the affidavits. *See Freeburg v. Lillydale Grand Central Corp.*, 284 Minn. 388, 393, 170 N.W.2d 330, 334 (1969) (no abuse of discretion in excluding witnesses not disclosed before trial, particularly since exclusion was based on local rule); *see also Montgomery v. American Hoist & Derrick Co.*, 350 N.W.2d 405, 408 (Minn.Ct. App.1984) (trial court properly refused to admit an affidavit submitted at the hearing, where the party had more than enough time to comply with a rule requiring filing 10 days before the hearing). We find no abuse of that discretion.

### II.

*Temporary injunctive relief*

■ Temporary injunctive relief should be granted only where the rights of the party seeking the injunction will be irrepa-

rably harmed before the case can be decided on the merits or where the relief sought in the main action will be ineffectual or impossible to grant. *Pickerign v. Pasco Marketing, Inc.*, 303 Minn. 442, 444, 228 N.W.2d 562, 564 (1975).

In deciding whether to grant a temporary injunction, the trial court weighs five factors, including:

The harm to be suffered by plaintiff if the temporary restraint is denied as compared to that inflicted on defendant if the injunction issues pending trial.

*Dahlberg Brothers, Inc. v. Ford Motor Co.*, 272 Minn. 264, 274–75, 137 N.W.2d 314, 321–22 (1965).

 Appellants claim that Rosewood failed to show irreparable harm from appellants' contacts with secondary market mortgage buyers. We agree.

Irreparable harm to an employer from a former employee's competing business is generally not inferred, as it is where competition follows the sale of a business. *See* Note, *Employment Contracts: Covenants Not to Compete in Minnesota*, 9 Wm. Mitch.L.Rev. 388, 394 (1984). In *Menter Co. v. Brock*, 147 Minn. 407, 410, 180 N.W. 553, 554 (1920), the supreme court indicated the necessity of some proof of irreparable damage from the former employee's breach of a covenant not to compete:

We think the breach of a like covenant in an employment contract does not so readily indicate irreparable injury to the employer. Injury is not shown by the mere fact that the employee has left the service and has entered the employ of a rival concern.

The supreme court has inferred harm, however, where the former employee was a salesman who began selling competing goods in the same trade area. *Thermorama, Inc. v. Buckwold*, 267 Minn. 551, 552, 125 N.W.2d 844, 845 (1964). Harm has also been inferred in the case of professional employees assumed to acquire a personal influence over patients or clients of their employer. *See Granger v. Craven*, 159 Minn. 296, 199 N.W. 10 (1924) (physician employed by another doctor).

In *Thermorama*, the case relied on by respondent, the employer alleged

a systematic solicitation of plaintiff's customers by defendant and active participation by him in a competitive business enterprise as a salesman * * * *.

*Thermorama*, 267 Minn. at 552, 125 N.W.2d at 845. The court gave little weight to the employee's counteraffidavit stating he had not competed for his employer's customers and "den[ying] there are any customers who belong exclusively to any particular seller." *Id.*

Hefty admits contacting institutions which bought mortgages from Rosewood while he was employed there. Like Buckwold in *Thermorama*, he denies that any of these institutions are exclusive customers, of Rosewood or any other mortgage company. Here, however, the evidence, which is limited to his deposition, not only supports this claim, but indicates that Hefty had no "personal hold upon the good will of the business," *Menter* 147 Minn. at 410, 180 N.W. at 555, which would support an inference of harm.

Although Hefty had "contacts" within institutions buying on the secondary market, they did not provide a reliable "clientele" but merely assured his company's mortgages would be considered. As in many financial markets, pricing rather than personal contacts predominates in market decisions, and prices appear to have been set by the large institutions. Thus, these large financial institutions dominated the market, at least as appears from the record here, unlike the retail store owners in *Thermorama* who bought from manufacturers and wholesalers where "personal contact" carried great weight.

Respondent failed to present any affidavits, depositions or other preliminary evidence as to characteristics of the secondary market on which to base an inference of harm to it from the competitive activities of Hefty and Metco. Respondent argues on appeal that there is a limited market for mortgages but has presented no evidence to the trial court to support this claim.

The record, to the contrary, tends to show that Rosewood, Metco, and others can coexist in the same market.

Without some showing of irreparable harm, the harm to Rosewood from the minimal additional competition of Metco would not exceed the harm to Metco of being barred entirely from that part of the market. The injunction covers one institution with which Metco did 40% of its business in a recent month, according to Hefty's deposition.

The trial court's ruling on a motion for a temporary injunction is largely an exercise of judicial discretion, not to be reversed absent a clear abuse of discretion. *Eakman v. Brutger*, 285 N.W.2d 95, 97 (Minn.1979). We believe, however, that it would be a clear abuse of discretion to infer irreparable harm from competitive activity of a former employee without evidence that that is so or facts as to market conditions indicating the inference can be made. Rosewood may still develop that evidence for presentation at a trial on the merits in order to obtain permanent injunctive relief or appropriate damages.

## DECISION

The trial court did not abuse its discretion in refusing to consider appellants' affidavits. The trial court erred in granting the temporary injunction.

Reversed.