**WEBB PUBLISHING COMPANY, Respondent,**

v.

**Neal T. FOSSHAGE, Appellant.**

**No. Cl–87–2444.**

Court of Appeals of Minnesota.

June 21, 1988.

Gregory J. Stenmoe, Michael Thomas Miller, Minneapolis, for respondent.

Jerry W. Snider, Jeff H. Eckland, Minneapolis, for appellant.

Heard, considered and decided by LANSING, P.J., and KALITOWSKI and SHORT, JJ.

## OPINION

LANSING, Judge.

After terminating appellant Neal Fosshage's employment as an account executive, respondent Webb Publishing Co. brought suit for damages and an injunction to enforce a noncompetition agreement allegedly signed by Fosshage. The trial court entered an ex parte temporary restraining order and, after a hearing attended by counsel for both parties, ordered a temporary injunction. Fosshage appeals.

## FACTS

Webb's custom publishing division creates, designs, prints and distributes custom magazines for companies across the United States. Webb is one of approximately 12 major national custom publishers, although there are several smaller operations.

In January 1980 Webb hired Neal Fosshage, who had 27 years of experience in marketing, as an account executive. His duties were not specified, but Fosshage's affidavit states that he solicited business and assisted Webb's clients in developing marketing strategies. Fosshage was the primary contact between Webb and four of its clients: Mobil, Melroe Company, American Cyanamid, and Valmont Industries. Those four clients produced $1.7 million of Webb's annual $3.8 million in custom publishing revenue.

On September 28, 1987, Webb terminated Fosshage's employment, allegedly because his aggressive style conflicted with corporate policy. In October 1987 Fosshage formed his own custom publishing corporation and solicited the business of American Cyanamid and Valmont Industries, both of which notified Webb of their intent to cancel their contracts with Webb. Webb brought this action seeking injunctive relief and damages based on Fosshage's noncompetition agreement.

Before the hearing on the temporary restraining order, Fosshage's counsel received Webb's motion papers and the name of the judge assigned to hear the motion. Fosshage's counsel did not appear at the hearing, and they dispute that they received notice of the time and place. Webb supported its TRO motion with affidavits alleging that in April 1986, in consideration for an increase in annual salary to $40,000 and an increased rate of commission, Fosshage signed the following noncompetition agreement:

> For a period of 18 months from termination of employment, I shall not, directly or indirectly, engage in or solicit or have any interest in any person, firm, corporation, or business that engages in or solicits, the publication or marketing of any custom publication, promotion piece, catalog, calendar, or any other printed material for any customer that has done business with the custom publishing division of Webb within the period of one year immediately prior to my termination of employment.

The notation "40M" appeared under Fosshage's signature on the agreement.

Webb's affidavits say that Fosshage was reminded of the noncompetition agreement the day after his termination, but said that he would not be stopped from talking to his friends. When told that his severance pay was conditioned on not contacting customers, Fosshage replied that they might as well not pay him.

Webb alleged that Fosshage had solicited the business of American Cyanamid and Valmont Industries, and if he successfully solicited the other two of his major clients, Webb's custom publishing division would lose approximately 45 percent of its revenue. Webb further alleged that the permanent loss of the business would affect Webb's business reputation and revenue, resulting in future indeterminable loss.

The trial court, without specific findings or conclusions, granted the temporary restraining order prohibiting Fosshage until further order from soliciting any customers with which Webb had done business since September 1986. Bond was set at $2,000, and a hearing on the request for a temporary injunction was set for December 3, 1987.

Fosshage made no motion to dissolve the TRO for procedural defects, but did submit an affidavit and memorandum in opposition to the temporary injunction. His affidavit states that although his signature on the noncompetition agreement appeared to be genuine, he did not recall having seen it before, had twice since April 1986 refused Webb's requests to sign noncompetition agreements, and did not learn they were claiming that he had signed one until October 1987. He stated that the salary and commission increases were not consideration for signing the agreement and that he did not have access to any confidential or proprietary information on custom publication. Finally, Fosshage asserted that his termination was contrary to his understanding that he would not be terminated without cause; he was never reminded of the noncompetition agreement; Webb had failed to pay commissions on sales which were not billed until after termination; and

he would be forced to file for bankruptcy if Webb's motion were granted.

The trial court granted a temporary injunction barring Fosshage for 18 months from soliciting any customer with which Webb had done business for a year prior to termination. The $2,000 bond was continued as security. In its memorandum the trial court found that Fosshage had entered into the noncompetition agreement for consideration which included an increase in annual salary and increased commissions; that Fosshage had solicited customers in violation of the agreement; that the agreement was individually negotiated by Fosshage; that Fosshage could still earn a living in custom publishing if he refrained from contacting Webb's customers; that if the temporary injunction were denied Webb would suffer irreparable harm to its current customers and its reputation; and that Fosshage had produced no persuasive evidence justifying his breach and it was likely Webb would succeed on the merits. The court concluded that Webb was entitled to injunctive relief, and Fosshage appeals.

### ISSUES

1. Did the trial court abuse its discretion in granting a temporary injunction enforcing the noncompetition agreement?

2. Did the trial court abuse its discretion in setting the bond at $2,000 or in issuing the temporary restraining order?

### ANALYSIS

### I

A temporary injunction should be granted only when it is clear that the rights of a party will be irreparably injured before a trial on the merits can be held. *Miller v. Foley*, 317 N.W.2d 710, 712 (Minn.1982). The issue on review is whether, viewing the facts most favorably to the prevailing party, the trial court clearly abused its discretion by a disregard of either the facts or applicable principles of equity. *Paradata of Minnesota, Inc. v. Fox*, 356 N.W.2d 852, 854 (Minn.Ct.App.1984) (citing *Cramond v.*

*AFL–CIO*, 267 Minn. 229, 234–35, 126 N.W. 2d 252, 256–57 (1964)).

The factors to be considered in determining whether to grant an injunction include:

(1) The nature and background of the relationship between the parties preexisting the dispute giving rise to the request for relief.

(2) The harm to be suffered by plaintiff if the temporary restraint is denied as compared to that inflicted on defendant if the injunction issues pending trial.

(3) The likelihood that one party or the other will prevail on the merits when the fact situation is viewed in light of established precedents fixing the limits of equitable relief.

(4) The aspects of the fact situation, if any, which permit or require consideration of public policy expressed in the statutes, State and Federal.

(5) The administrative burdens involved in judicial supervision and enforcement of the temporary decree.

*Dahlberg Brothers, Inc. v. Ford Motor Co.*, 272 Minn. 264, 274–75, 137 N.W.2d 314, 321–22 (1965). No statutory policies or administrative burdens appear, and there is no fiduciary or other significant relationship between the parties. We therefore focus on the balance of harm and the likelihood of success on the merits.

*1. Balance of harm.* Irreparable injury can be inferred from the breach of a restrictive covenant if the former employee came into contact with the employer's customers in a way which obtains a personal hold on the good will of the business. *Menter Co. v. Brock*, 147 Minn. 407, 410, 180 N.W. 553, 554–55 (1920); *see also Thermorama, Inc. v. Buckwold*, 267 Minn. 551, 552–53, 125 N.W.2d 844, 845 (1964) (systematic solicitation of former employer's customers supports inference of irreparable harm). However, the inference may be rebutted by evidence that the former employee has no hold on the good will of the business or its clientele. *See Rosewood Mortgage Corp. v. Hefty*, 383 N.W.2d 456, 459–60 (Minn.Ct.App.1986).

The evidence in this case sufficiently supports the court's inference of irrepa-

rable harm. Fosshage worked closely with Webb's clients, considered them friends, and at least one client considered him part of "a winning team." His success in soliciting their business demonstrates the "personal hold" he had on them. Loss of American Cyanamid and Fosshage's other customers would cost Webb 45 percent of its custom publishing revenue, and the damage to its business reputation in that area would be substantial and not easily measured.

It is less clear that harm to Webb outweighs harm to Fosshage. Custom publishing appears to produce only a small percentage of Webb's total revenue. On the other hand, Fosshage produced no evidence of harm except for the assertion in his affidavit that he would be forced into bankruptcy if the injunction issued. The record does not show why he is unable to transfer his experience into soliciting clients who were not Webb's customers or that there is an absence of potential clients for custom publishing.

On this record, the trial court's finding that irreparable injury to Webb outweighed potential injury to Fosshage was not clearly erroneous.

*2. Likelihood of Success on the Merits.* Fosshage maintains that the noncompetition agreement is unenforceable due to (1) invalidity; (2) Webb's breach of the employment agreement; (3) lack of consideration; and (4) unreasonableness.

■ *a. Invalidity.* Although Fosshage admitted that the signature on the noncompetition agreement produced by Webb appeared genuine, he argues that it is unenforceable because Webb did not execute it. Fosshage relies on *Winter v. Skoglund,* 404 N.W.2d 786, 790–92 (Minn.1987), and *Stub v. Grimes,* 38 Minn. 317, 319–20, 37 N.W. 444, 445–46 (1888), but both cases relate to the enforceability of multilateral rather than bilateral contracts.

The general rule is that

[o]ne who signs his name to a writing that purports to be a contract does an act that is strong evidence that he intends to make himself a party thereto, bound as a promisor and entitled as a promisee.

Even if he does not so intend, the principles of estoppel may bind him notwithstanding [unless] the other parties know or have reason to know that such is not the intention.

1 *Corbin on Contracts* § 31 (1963). There is no evidence that Fosshage did not intend to be bound unless Webb signed the document, and Fosshage's receipt of the pay increase might estop him from arguing lack of intent to be bound. Although there are factual issues on the existence of the contract, the trial court's conclusion that Fosshage is unlikely to succeed with this defense was not clearly erroneous.

*b. Webb's breach of contract.* Fosshage argues that Webb breached its employment agreement by terminating him without cause or notice. The Minnesota Supreme Court has held that termination of an employment contract does not preclude enforcement of a restrictive covenant, at least where the employer has not taken "undue advantage" of his right to terminate. *Granger v. Craven,* 159 Minn. 296, 304–05, 199 N.W. 10, 14 (1924). However, wrongful termination may preclude enforcement of restrictive covenants. *Edin v. Josten's, Inc.,* 343 N.W.2d 691, 694 (Minn.Ct.App.1984) (injunctive relief will not be granted where conduct has been unconscionable by reason of bad motive).

■ Because there was no written employment agreement, Fosshage relies on an implied-in-fact agreement established by personnel policies, custom and practice, and oral representations. Although an at-will employment contract can be modified by subsequent agreement, this agreement cannot be inferred from general statements of policy. *See Pine River State Bank v. Mettille,* 333 N.W.2d 622, 626 (Minn.1983). The record does not establish the existence and amount of Fosshage's entitlement to commissions and severance pay. On this record, the trial court's finding that Fosshage had failed to establish a likelihood of success on this defense was not clearly erroneous.

■ *c. Lack of Consideration.* Fosshage claims that the noncompetition agree-

ment was unsupported by consideration because his pay increase was part of an annual performance review and account executives who did not sign noncompetition agreements were allowed to participate in increased commissions. Webb's affidavits say that the increase in pay occurred just six months after Fosshage's last annual review, and consideration for the agreements was negotiated with each account executive individually. Fosshage's argument is weakened by the notation "40M" under his signature. "The adequacy of consideration for a noncompetition contract or clause in an ongoing employment relationship should depend on the facts of each case." *Davies & Davies Agency, Inc. v. Davies,* 298 N.W.2d 127, 130 (Minn.1980). Although there are fact issues, the trial court did not err in concluding that Webb was likely to succeed on this issue.

■ *d. Unreasonableness.* Because restrictive covenants are agreements in restraint of trade, they are enforced only to the extent reasonably necessary to protect a legitimate business interest. *Bennett v. Storz Broadcasting Co.,* 270 Minn. 525, 534, 134 N.W.2d 892, 899–900 (1965). Fosshage argues that the noncompetition agreement does not protect any legitimate interest of Webb's and that it is unreasonable in scope and duration.

*1) Legitimacy of Interest.* Employers have a legitimate interest in protecting themselves against "the deflection of trade or customers by the employee by means of the opportunity which the employment has given him." *Id.* at 533, 134 N.W.2d at 898. Although Fosshage disavows any "sensitive relationship" with his customers, their decision to remain with him indicates the strength of the relationship. *Compare Continental Car-Na-Var Corp. v. Moseley,* 24 Cal.2d 104, 107, 148 P.2d 9, 12 (1944) (no ongoing relationship with purchasers of floor cleaners where "[e]ach sale is a distinct transaction, not necessarily implying that another will follow.")

Fosshage argues that the client relationship is "largely the product of his own labors," and Webb cannot preclude him from continuing a business relationship.

His reliance on *Sanitary Farm Dairies, Inc. v. Wolf,* 261 Minn. 166, 112 N.W.2d 42 (1961), is misplaced; the case did not involve a restrictive covenant, as the court expressly noted in its holding. *Id.* at 174–75, 112 N.W.2d at 48. Nor do Fosshage's other cited cases support his argument. *See Klick v. Crosstown Bank of Ham Lake, Inc.,* 372 N.W.2d 85, 88 (Minn.Ct. App.1985) (evidence showed that employee did not develop *any* special relationships with customers); *Granger* 159 Minn. at 302–03, 199 N.W. at 12 (enforcement of a restrictive covenant permitted because a substantial part of the employer's practice would otherwise leave with the employee.)

Fosshage's relationship with Webb customers was sufficiently close to give Webb a legitimate interest in protecting itself against Fosshage's solicitation of those customers.

*2) Reasonableness of restriction.* The temporal duration and geographic area of the restriction do not appear unreasonable, given the national character of Webb's business and the time required to establish a relationship between Fosshage's former customers and his replacement. *See Klick,* 372 N.W.2d at 88.

■ However, the scope of the restriction suggests overbreadth in light of its purpose. Webb's only asserted interest is to protect itself from Fosshage's solicitation of his former customers. If Fosshage had access to information on other Webb customers which would aid him in soliciting their business, then restricting him from doing so would not be unreasonable. However, the record does not indicate such access but, rather, that clients are the responsibility of individual account executives without overlap.

Because the trial court did not address this issue, we remand for consideration of the appropriate scope of the restraint. In view of the harsh effect of the injunction on Fosshage's ability to earn a living, the trial court should also consider expediting trial pursuant to Minn.R.Civ.P. 65.02.

## II

 Fosshage raises two additional issues which relate primarily to the initial issuance of the temporary restraining order. First, Fosshage argues that a $2,000 bond is insufficient security as a matter of law. However, he failed to suggest an appropriate amount to the trial court at the temporary injunction hearing. The trial court has wide discretion in determining the amount of the bond, *Petition of Giblin*, 304 Minn. 510, 524, 232 N.W.2d 214, 223 (1975), and under these circumstances we do not find an abuse of discretion. We note that to the extent his appeal is directed at the bond set for the temporary restraining order, $2,000 is not unreasonable because of the limited duration of that order. Also, if Fosshage prevails on his wrongful discharge claim, damages would probably duplicate his loss sustained by reason of the injunction.

Second, Fosshage argues that the trial court erred by granting the temporary restraining order without (1) any showing that Webb would suffer immediate and irreparable harm before Fosshage could be heard in opposition, or (2) a written statement of the efforts Webb had made to give notice. Webb argues that it did notify Fosshage's counsel of the hearing, and therefore a written statement of the attempts to give notice was not required.

Minn.R.Civ.P. 65.01 provides:

A temporary restraining order may be granted without written or oral notice to the adverse party or his attorney only if (a) it clearly appears from specific facts shown by affidavit or by the verified complaint that immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party or his attorney can be heard in opposition, and (b) the applicant's attorney states to the court in writing the efforts, if any, which have been made to give notice or the reasons supporting his claim that notice should not be required. * * *

 The purpose of the rule is to restrict ex parte orders to those situations where notice is not practicable or not heeded. To achieve that purpose and facilitate review, trial courts should not issue ex parte restraining orders without written statements of notice. However, issuance of the TRO in this case was not an abuse of discretion. It is undisputed that Fosshage's counsel was informed of the judge assignment and could have contacted the judge's clerk to learn if a hearing had been scheduled. Webb did submit an affidavit which alleged immediate injury if the TRO did not issue, since there was only a "brief window of opportunity" during which Webb's relationships with clients solicited by Fosshage could be salvaged. Finally, Fosshage was not prejudiced by the fact that the order was continued as a temporary injunction, because he had ample notice of, and appeared at, the hearing on the injunction.

### DECISION

Affirmed in part; remanded in part.