Paul J. HRUSKA, Respondent,

v.

CHANDLER ASSOCIATES, INC., Petitioner,

v.

Scott BAGNE and Pendle-Hansen-Bagne, Inc., Respondents.

No. C3–84–342.

Supreme Court of Minnesota.

Aug. 16, 1985.

---

Maslon Edelman Borman & Brand, William Z. Pentelovich, Minneapolis, for petitioner.

Klampe & Pingatore, Michael D. Klampe, Rochester, for respondent Hruska.

Hunt, Devinny, Young & Smith, Rochester, for respondents Bagne.

## OPINION

PETERSON, Justice.

This case arose as a result of the assignment by petitioner, Chandler Associates, Inc. (Chandler), of respondent Paul J. Hruska's employment agreement and covenant not to compete to Pendle-Hansen-Bagne, Inc. and owner Scott Bagne as part of the sale of an insurance agency. The trial court granted Hruska's claim for additional salary pursuant to the employment agreement, denied his claims for commissions for new business brought to the agency and penalties for late payment of his salary, and refused to admit parol evidence supporting Hruska's claim for additional severance benefits. The court also held that the covenant not to compete was discharged because Chandler and Bagne had materially breached the employment agreement. The court of appeals, 356 N.W.2d 370 (1984), affirmed this final issue, but reversed the others. We affirm in part and reverse in part.

Prior to January 1, 1980, Paul Hruska was a 24-year employee and 26% owner of an insurance agency known as Pendle-Hansen-Bagne, Inc., located in Rochester, Minnesota. On January 1, 1980, Chandler purchased all of the stock of the agency, dissolved the agency, and continued to operate its business under the name of "Chandler-Rochester." Included in the stock purchased by Chandler were 21.419 shares owned by Hruska, which he sold under a stock purchase agreement for $136,000 ($36,000 down plus a promissory note for the remainder). In addition, Hruska agreed to continue working for Chandler as a general insurance agent, subject to terms set by an employment agreement.

The employment agreement guaranteed Hruska's employment with Chandler for a period of 1 year at a salary of $36,000. Thereafter, Hruska was to receive a percentage of commissions, totaling not less than $36,000, but the agreement was terminable at will by either party without cause. The agreement also contained a covenant not to compete for 5 years after termination of Hruska's employment, re-duced to a 3-year limitation if terminated by the employer without just cause, and provided that if Hruska violated the covenant, $78,000 was to be withheld from payments due on the promissory note for the sale of stock. Finally, the agreement provided that Hruska would receive severance benefits for 36 months following termination of his employment. Both the employment agreement and the stock purchase agreement were executed January 1, 1980.

On April 1, 1982, Chandler sold the assets of the agency to respondent Scott Bagne, who reinstated the name Pendle-Hansen-Bagne, Inc. (hereafter jointly known as Bagne). At the time of the sale, Hruska was still employed by Chandler, and his employment agreement, including the covenant not to compete, was assigned to Bagne as part of the sale assets. Hruska immediately commenced an action seeking a declaratory judgment that the employment agreement was not assignable and that he was not bound by the covenant not to compete.

While this action was pending, Bagne offered Hruska an entirely new employment contract containing a 2-year covenant not to compete and, more importantly, decreasing Hruska's salary from $36,000 to $20,000. Hruska never accepted the new agreement. Nonetheless, Bagne tendered payments to Hruska based on $20,000 per year in salary.

When Hruska refused to accept either the modified agreement or his first paycheck from Bagne, Bagne decided to discharge Hruska and on several occasions asked Chandler to terminate Hruska's employment. Chandler had a motion for a summary judgment dismissing Hruska's declaratory judgment action pending, however, and advised Bagne that it would be poor trial strategy to terminate Hruska's employment prior to a scheduled hearing. Soon after the hearing, on June 18, 1982, Hruska's employment was terminated on the grounds that he refused to accept the cut in salary; that he was challenging the assignment of his employment agreement;

and, according to Bagne's testimony, that he was not in the office much after April 1982.

Under his employment agreement, Hruska was entitled to severance benefits from Chandler for 36 months following termination of his employment, payable at the end of each quarter of Chandler's fiscal year. Chandler failed to make any payments until February 28, 1983, when it paid $1,508.02 for the quarter ending September 30, 1982, and $1,315.83 for the quarter ending December 31, 1982. On May 23, 1983, Chandler paid $1,448.09 for the quarter ending March 30, 1983.

The trial court granted Chandler's summary judgment motion in part, ruling that the covenant not to compete was assignable. Prior to trial on the issues not disposed of by the partial summary judgment, Hruska amended his complaint to claim unpaid salary, expenses, new account commissions, and severance benefits.

On appeal, we are faced with the following issues:

(1) whether the trial court erred in excluding parol evidence as to the amount of Hruska's severance benefits;

(2) whether the covenant not to compete is discharged because of the actions of Hruska's employers;

(3) whether Hruska is entitled to a penalty under Minn.Stat. § 181.13 (1982); and

(4) whether Hruska is entitled to new business commissions for 1981 and 1982.

1. The challenged portion of Article 6 of Hruska's employment agreement with Chandler provides for payment of the following severance benefits:

A. In the event of the termination of employment of Employee by Employer for any reason, including the death or retirement of Employee, Employer agrees to pay Employee, or to the legal representative of the estate of the Employee in the case of the death of Employee, for a period of thirty-six (36) consecutive months commencing with the month following the month during which the termination of the Employee's employment occurs, the following percentage of the commissions of the Employee:

(1) Twenty-eight (28%) percent per month of the net commission income received by Employer payable on a monthly basis for thirty-six (36) consecutive months, arising out of that total book of business sold and serviced by Employee prior to Employee's sale of stock to Employer, provided, however, in the event the net commission income exceeds One Hundred Twenty Thousand and No/100 ($120,000.00) Dollars per annum, then Employee shall receive additional payments contemplated in paragraph (2) below.

Hruska contends that despite language in the agreement that Chandler interprets as awarding him approximately $17,000 in severance benefits, the parties had orally agreed to a fixed amount of $100,000 for severance benefits as part of the sale price of Hruska's stock, and he seeks to introduce parol evidence to support his claim. Specifically, Hruska claims that the severance benefit was to provide for payment in each of 3 years of 28% of $120,000, a figure arrived at by multiplying Hruska's percentage of ownership of the business (26%) by the revenues or expirations of the agency ($472,000), for a total of $100,000. At Chandler's insistance, this $100,000 was allocated to deferred compensation to allow Chandler, as Hruska contended in his written offer of proof, "to defer payment and depreciate the same for tax purposes."

Hruska contends that the draft of the employment agreement that immediately preceded the final, executed draft contained the following severance provision:

Eighty-three (83) percent of a One Hundred Twenty Thousand and no/100 ($120,000.00) Dollars which amount represents the amount of employee's "book of business" serviced by employee at the time of the sale of employee's stock to Chandler-Lang Agency, Inc.

The parties, at Chandler's suggestion, modified the final draft not to change the amount but solely to avoid a possible mistake in interpretation that would result in payment of 83% of $120,000 in each of 3 years, totaling $300,000. It is the foregoing evidence that Hruska wishes to introduce to vary the written terms of the agreement.

■ The parol evidence rule seeks to minimize the risk of future litigation by encouraging parties to put their entire agreement in writing, providing that when parties reduce their agreement to writing, parol evidence is ordinarily inadmissible to vary, contradict, or alter the written agreement. *Flynn v. Sawyer*, 272 N.W.2d 904, 907–08 (Minn.1978). This sometimes-harsh rule is not without exceptions, however, and Hruska contends parol evidence is admissible in this case under either of two exceptions we have previously recognized.

■ First, Hruska contends that because the agreement is ambiguous, parol evidence is admissible to explain the meaning of its terms. *See e.g., id.; Bussard v. College of St. Thomas, Inc.*, 294 Minn. 215, 224, 200 N.W.2d 155, 161 (1972). This ambiguity allegedly stems from the agreement's failure to designate the period of time referred to by the phrase "arising out of" for purposes of computing "[t]wenty-eight (28%) percent per month of the net commission income received by Employer * * * *arising out of* that total book of business sold and serviced by Employee prior to Employee's sale of stock." (Emphasis added.) The trial court found this provision unambiguous, however, and we agree. Although this provision certainly could have been drafted more clearly, the interpretation proposed by Chandler—that Hruska is entitled to 28% per month of the commissions the Employer receives in the 36 months following termination of Hruska's employment attributable to those policies sold and serviced by Hruska prior to his sale of stock to Chandler—is a reasonable one that gives effect to every word of the agreement. In contrast, the agreement's language contains no support for

Hruska's contention that the provision can be "clarified" to provide for 28% of $120,-000 per year for 3 years.

Second, Hruska contends that parol evidence is admissible under another recognized exception to the general rule—the written agreement intentionally misstated the true consideration to deceive a third party. The question of under what circumstances parol evidence is admissible to show that a written agreement was not intended by either party to be enforced pursuant to its terms but rather was so drafted to deceive another has had a checkered history. We held in the old case of *Graham v. Savage*, 110 Minn. 510, 126 N.W. 394 (1910), that parol evidence was not admissible to prove that an agreement falsely stated the plaintiff-salesman's salary to mislead other salesmen-employees as to the amount the plaintiff was paid. In reaching its conclusion, the court reasoned that "we should not vary the general rule as to the exclusion of evidence by making an exception in aid of such an illegitimate purpose and in violation of common honesty." *Id.* at 515, 126 N.W. at 396. The *Graham* decision has been criticized, however, as, among other things, an inappropriate application of the clean hands doctrine, and that criticism in particular has merit since the parol evidence rule is not an equitable remedy. 23 Minn.L.Rev. 382, 384 (1939). *See also* 3 A. Corbin, Corbin on Contracts § 577, at 393–94 (1960); Strahorn, *The Unity of the Parol Evidence Rule*, 14 Minn.L.Rev. 20, 31 (1929); 12 Minn.L.Rev. 183, 184 (1928). Although our subsequent cases have undertaken to distinguish *Graham* without expressly overruling it, *see Hield v. Thyberg*, 347 N.W.2d 503, 508 (Minn.1984); *Flynn v. Sawyer*, 272 N.W.2d 904, 908 (Minn.1978); *Hamilton v. Boyce*, 234 Minn. 290, 294, 48 N.W.2d 172, 175 (1951); *Summit Mercantile Co. v. Daigle*, 146 Minn. 218, 220, 178 N.W. 588, 589 (1920), it is clear that *Graham* has by now been effectively overruled and, accordingly, is now expressly overruled.

■ Notwithstanding the *Graham* decision, in prior case law we have uniformly distinguished between evidence tending to show that no agreement was ever made and evidence seeking to contradict, vary, or add to the terms of a written contract. *Hamilton v. Boyce*, 234 Minn. at 292, 48 N.W.2d at 173–74. Evidence is admissible to show that the parties, in effect, never entered into a binding agreement because the written agreement was intended as a sham. *Id.* Thus, in *Summit Mercantile Co. v. Daigle*, 146 Minn. 218, 178 N.W. 588 (1920), we admitted evidence that a mortgage was never intended to have any effect between the parties, and in *Hamilton v. Boyce*, 234 Minn. 290, 48 N.W.2d 172 (1951), we admitted evidence showing that a partnership agreement was never intended to have that effect between the parties. What is important in these cases is that the parties never intended that the agreements' terms affect their own relations—parol evidence is admissible to prove such a claim.

Evidence tending to contradict or vary the terms of an otherwise valid contract is, however, in a different category. It is in this circumstance that the parties' purpose in so drafting the agreement becomes important and the "intent to deceive a third party" exception arises, an exception that we recently articulated in *Hield v. Thyberg*, 347 N.W.2d 503 (Minn.1984). Hield had agreed to sell his business to Thyberg under a contract that stated a cash sale price of $15,000, but parol evidence indicated that the agreement misstated the consideration—that in addition to the $15,000 down, Thyberg had agreed to give Hield a $35,000 demand note. Hield explained that Thyberg intended to apply for a loan from the Small Business Administration (SBA) and consequently did not want the $35,000 liability to show up on his balance sheet, so Hield had his secretary indicate $15,000 as consideration for the sale. We allowed introduction of parol evidence to prove this claim, stating:

> [W]here the parties have entered into a written contract, complete and unambiguous on the consideration to be paid, but it is claimed that the consideration was not as stated so that the contract might be used to mislead or deceive a third party, parol evidence is usable; but the party seeking to vary the terms of the written contract in this situation has the burden of establishing his claim by clear and convincing evidence.

*Id.* at 508.

■ Contrary to Hruska's contention, the instant case does not fall within the exception clarified by *Hield*. In *Hield*, we concluded that because Thyberg had not disclosed the debt to the SBA prior to receiving the loan, "the net impact of Hield's claim is that Thyberg defrauded the SBA with the written assignment." *Id.* In contrast, Hruska makes no mention of any intent to defraud but rather claims only that the parties drafted the provision as they did "for tax purposes," as a way of shifting tax burdens pursuant to the sale of a business. There is a distinction, however, between the kind of tax avoidance measures that Hruska cites and actual tax evasion measures intended to deceive the federal Internal Revenue Service (IRS). It is a common commercial practice, of which the IRS is well aware, to structure agreements to minimize the tax consequences of a sale of a business. These types of tax avoidance measures, used as a matter of course in business sales, do not "deceive" the IRS. Furthermore, in view of the frequency of such arrangements, allowing introduction of parol evidence by anyone making a claim such as that made by Hruska would provide so expansive an exception as to threaten emasculation of the parol evidence rule in the sale of a business. Accordingly, we hold that Hruska's claim of tax avoidance does not satisfy the "deceit of a third party" exception to the parol evidence rule.[1]

---

1. Although we do not base our decision on the inadequacy of Hruska's offer of proof to the trial court requesting admission of parol evidence, we do note that the offer of proof made no mention that the agreement was drafted to deceive the IRS, but only "to defer payment and

2. Neither party claims that the covenant not to compete is in itself invalid; the issue is whether the conduct of Chandler and Bagne justifies refusing to enforce an otherwise valid covenant not to compete.[2] Initially, it should be noted that Hruska claims that because he has not violated the covenant and it expired on June 18, 1985, the issue is moot. Although this issue may be moot for purposes of an injunction, Chandler presumably still has a right to damages if the covenant has been violated.

■ Hruska urges that we hold the covenant discharged because Chandler and Bagne have "unclean hands." We subscribe to the maxim that "he who seeks equity must do equity, and he who comes into equity must come with clean hands," see *Johnson v. Freberg*, 178 Minn. 594, 597–8, 228 N.W. 159, 160 (1929), and equitable concerns influence whether a covenant not to compete should be enforced. *See Granger v. Craven*, 159 Minn. 296, 199 N.W. 10 (1924). *See also, Marso v. Mankato Clinic Ltd.*, 278 Minn. 104, 153 N.W.2d 281 (1967); *North Pac. Lumber Co. v. Oliver*, 286 Ore. 639, 596 P.2d 931 (1979); *Bailey Employment Serv., Inc. v. Moore*, 638 S.W.2d 641 (Tex.Civ.App.1982). We do not agree, however, that the actions of Chandler and Bagne constitute "unclean hands" under the definition articulated in *Johnson v. Freberg*, 178 Minn. 594, 597–98, 228 N.W. 159, 160 (1929):

The misconduct need not be of such a nature as to be actually fraudulent or

constitute a basis for legal action. The plaintiff may be denied relief where his conduct has been unconscionable by reason of a bad motive, or where the result induced by his conduct will be unconscionable either in the benefit to himself or the injury to others.

Chandler and Bagne's only "misconduct" was keeping Hruska on the payroll for more than 2 months while paying him an annual salary of only $20,000, instead of the $36,000 he was entitled to under his employment agreement. Had this action forced Hruska to resign and accordingly face a 5-year competition restriction instead of the 3-year restriction that arose because his employer discharged him without cause, equity might have mandated a refusal to enforce the covenant for the additional 2 years. That did not occur, however, and we cannot characterize a failure to pay Hruska's salary in full for a brief period of time—salary which Hruska has since recovered—as "unclean hands" rendering the covenant not to compete unenforceable.

■ A second possible basis for denying enforcement is the trial court's determination that Bagne and Chandler materially breached the contract. A contractual provision may be unenforceable because one party's breach entitled the other party to rescind the entire contract. *See, e.g., Marso v. Mankato Clinic Ltd.*, 278 Minn. 104, 153 N.W.2d 281 (1967). The stock purchase agreement indicates, however, that

---

depreciate the same for tax purposes." It is questionable whether this offer of proof complied with the provisions of Minn.R.Evid. 103, which requires that "the substance of the evidence [b]e made known to the court by the offer."

**2.** In relevant part, Article 5 of the employment agreement provided:

B. Employee agrees that for a period of five years after the termination of employment, Employee shall not, either on his behalf or on behalf of any other person, firm, partnership, corporation, or other organization, directly or indirectly solicit or in any manner, attempt to sell insurance of any kind whatsoever to any person, firm, partnership, corporation, or other organization which was an account or client of Employer, at any time

during the period Employee was employed by Employer.

C. In the event that the covenant contained in this section is considered by a court of competent jurisdiction to be excessive, either in its duration or in any other respect, it shall be considered modified and valid for such duration or in such respect as said court may determine reasonable under the circumstances.

\* \* \* \* \* \*

E. In the event that Employee is terminated by Employer without just cause and at Employer's discretion as in accordance with subparagraph 2 herein, then the Covenant Not to Compete and all terms and conditions as set forth in this paragraph shall only be for the period of (3) years after said termination.

the covenant not to compete was part of Hruska's sale of stock and that the severance benefits provided in the employment agreement were part of the compensation he received for the sale; thus, these provisions are dependent, and declaring the covenant not to compete discharged would require a similar discharge of the severance benefit provision. *Cf. Anderson v. Kammeier*, 262 N.W.2d 366 (Minn.1978). Hruska is clearly seeking enforcement of the severance benefit in this action, and therefore we decline to extinguish that provision by declaring the covenant not to compete unenforceable.

■ 3. Minn.Stat. § 181.13 (1982) provides that when an employee is discharged:

[T]he wages or commissions actually earned and unpaid at the time of such discharge shall become immediately due and payable upon demand of such employee, * * * and if not paid within 24 hours after such demand * * * such discharged employee may charge and collect the amount of his average daily earnings at the rate agreed upon in the contract of employment, for such period, not exceeding fifteen days * * *.

Hruska's employment was terminated on June 18, 1982; he demanded payment of his wages by letter dated August 27, 1982; his demand was not met within 24 hours. Nonetheless, Chandler here contends that Hruska is not entitled to a penalty because under his employment agreement his wages were not payable until March 15, 1983, and Hruska made no demand for payment after that date.

The statute provides that wages and commissions "earned and unpaid at the time of discharge *shall become immediately due and payable* upon demand of employee" (emphasis added) and that the employee is entitled to a penalty if the wages are not paid within 24 hours. It does not provide for payment upon demand only of those wages already "due and payable," as Chandler in effect argues. Thus, since Hruska's wages were "earned and unpaid" at the time he made his demand, a penalty should be assessed.

4. Hruska received commissions only for new accounts he secured in 1980 but argues that Article 3 of his employment agreement entitles him to new business commissions for 1981 and 1982 as well, totaling $6,184.25. Article 3 provides:

*Compensation.* The Employer shall pay to the Employee Thirty-six Thousand and No/100 ($36,000.00) Dollars as a base salary in equal monthly installments during the first year of this agreement, plus fifty (50%) percent of the net commission income received by Employer from new accounts secured by Employee, payable on or about March 15 following the employment year during which said commission payments accrue. The base salary for the second employment year, and each year thereafter, shall be that amount equal to thirty (30%) percent of the amount of the commissions on the total "book of business" of all commissions actually received by Employer prior to the end of the fiscal year of Employer on all policies of insurance sold by Employee and serviced by the Employee while employed by the Employer, but no less than Thirty-six Thousand and No/100 ($36,000.00) Dollars.

It is agreed by and between Employer and Employee that the thirty (30%) percent of net commissions of the total "book of business" referred in the above paragraph shall mean those accounts which Employee serviced prior to January 1, 1980, together with all accounts Employee services after January 1, 1980. It is also agreed that Employee will continue to service those accounts he serviced prior to January 1, 1980. The aforesaid payments to Employee for any particular fiscal year of Employer shall be paid to the Employee on March 15 of the following fiscal year; provided however, that Employer may, in its sole discretion, pay any portion of said payments, in advance, in such periodic installments as it may elect. In the event the fiscal year end of the Employer should be changed to other than December 31, said payments shall be paid to

Employee within 75 days at the end of any such fiscal year.

We agree with Hruska's contention. Had the agreement intended payment of new business commissions only in the first year, it would have required payment "on or about March 15, 1981," instead of "on or about March 15 following the employment year during which said commissions accrue." Reading the provision as a whole further supports this interpretation, since it provides for two-part compensation: a base salary *plus* new business commissions. Although the $36,000 base salary is revised "for the second employment year, and each year thereafter," the provision makes no change in payments of new business commissions, and presumably that part of Hruska's compensation was intended to remain the same.

Affirmed in part, reversed in part, and remanded to the court of appeals for remand to the district court with directions to amend its judgment in accordance with this opinion.