**Timothy P. MILLARD, Plaintiff,**

v.

**ELECTRONIC CABLE SPECIALISTS and Electrical Conservation Systems, Inc., a Wisconsin corporation, Defendant.**

**Civ. No. 4–91–816.**

United States District Court,
D. Minnesota,
Fourth Division.

Jan. 28, 1992.

Order Modifying Preliminary Injunction March 10, 1992.

Second Order Modifying Preliminary Injunction April 3, 1992.

Gregory James Stenmoe, Briggs & Morgan, Minneapolis, Minn., for plaintiff.

Linda Louise Holstein, Opperman Heins & Paquin, Minneapolis, Minn., Donal M. Demet, Milwaukee, Wis., for defendant.

## MEMORANDUM OPINION AND ORDER

DIANA E. MURPHY, District Judge.

Timothy P. Millard brought this action in state court against Electronic Cable Specialists and Electrical Conservation Systems, Inc., a Wisconsin corporation (ECS), claiming wrongful discharge, breach of an employment agreement, conversion, negligence, and seeking a declaratory judgment that a covenant not to compete was invalid. ECS removed to this court, alleging diversity jurisdiction. ECS counterclaimed for breach of contract and breach of implied duty of honesty and loyalty, and seeks to have Millard enjoined from competing against it in violation of the covenant not to compete. Now before the court is the motion by ECS for a preliminary injunction to prevent Millard from violating the covenant not to compete.[1]

I.

The principal characters in this dispute are Paul Smyczek, the president of ECS, and Millard, formerly a sales engineer/sales manager with ECS. ECS was founded by Smyczek in 1984. It produced cables, particularly for medical equipment manufacturers. In 1985, it began developing the kind of cables required in Federal Aviation Administration (FAA) regulations for Traffic Alert and Collision Avoidance Systems (TCAS). ECS became a well-known cable supplier in the aviation industry to meet the TCAS requirements.

In late 1988, ECS became interested in hiring Millard as part of its sales force for TCAS cables. Millard joined ECS on January 2, 1989, after several years as a manager at Honeywell.[2] He negotiated personally with Smyczek. He contends that Smyczek offered him a future equity interest in ECS. On January 4, 1989, Millard and ECS entered an employment agreement which includes a covenant not to compete. The covenant reads in relevant part:

> The employee agrees that he will not, for a period of one (1) year after the termination of his employment, regardless of the cause of termination, within the continental United States, engage in any

---

1. The court received Millard's surreply memorandum and accompanying affidavit the morning of the hearing. ECS submitted three documents in response shortly after the hearing. Because the issues raised by these submissions were addressed at oral argument by both sides, these late submissions should be filed and considered on the present motion.

2. Millard apparently remained on the payroll at Honeywell into February 1989. He states that this must have been an administrative matter related to severance pay because he submitted his resignation in December 1988, prior to going to ECS.

business or perform any service, directly or indirectly, in competition with the business of [ECS], or have any interest whether as a proprietor, partner, employee, stockholder, principal, agent, consultant, director, officer or in any other capacity or manner whatsoever, in any enterprise which shall be so engaged.

ECS memorandum, exhibit B. According to Millard, he had a long-standing interest in aviation and exposure to research and development of new avionics systems. According to ECS, he had sales and management experience in telecommunications but no aviation engineering background; ECS taught him everything he knows in this field.

Millard was given increasingly more significant responsibilities at ECS. He travelled to meet with ECS's customers and potential customers. He was eventually given responsibility for ECS's entire commercial aviation sales efforts.

The parties dispute whether ECS developed aviation engineering services prior to Millard's termination in July 1991. According to ECS, in 1989 and 1990 the company began to realize that its competitive position required it to expand beyond providing hardware to include the provision of engineering services to its customers. In April 1991, pursuant to Millard's recommendation, ECS hired Miguel Flores who could provide FAA Designated Engineering Representative (DER) services. Millard worked closely with Flores in developing these services for ECS. In late June or early July 1991, ECS learned that one of its customers, Key Air, required engineering services in connection with its purchase of TCAS hardware. Millard stated that Flores was too busy to provide these services, and recommended hiring David Sindelar, an engineer formerly with Northwest Airlines, as an outside contractor to meet Key Air's needs.

Millard contends that ECS never did provide engineering services, as those services are understood in the industry. He states that ECS sold cable and related hardware and merely assisted customers in the proper installation of the cable. When ECS learned of the difficulties at Key Air, Millard knew that ECS did not have anyone available who had the skill to perform the engineering services requested. He suggested that Sindelar be hired to do this, through an entity Sindelar had established, North American Aerospace Engineering (NAAE). In June or July 1991, Millard suggested to Smyczek that ECS consider offering engineering services itself either directly or through a separate but affiliated company.

According to Millard, Smyczek rejected this proposal, stating that important ECS cable customers already provided these services and would look askance at ECS if it began competing with them. About this time, July 1991, Millard confronted Smyczek about the unfulfilled promise of an equity interest in ECS. Smyczek did not respond. Shortly thereafter, Smyczek notified Millard that he was placed on a 30–day "cooling off period," would have his salary cut, and that ECS would repossess certain property Millard was using. Millard felt this was without justification; he took it as a constructive discharge. ECS formally discharged him on August 30, 1991.

ECS contends that in July 1991, Smyczek became aware that Millard was attempting to restructure ECS's sales force without his authorization. Millard told Smyczek he was a poor manager and that Millard wanted to be president and to have an ownership interest. Smyczek found out that Millard and Sindelar had a side business going (NAAE) creating a conflict of interest for Millard at ECS. After all this, Smyczek suspended Millard to give him time to consider whether he desired to continue with ECS. Millard failed to return to active work and was discharged.

It is undisputed that Millard started Canard Aerospace in September 1991, a new company which provides aviation engineering services. Sindelar joined Canard as an employee. According to ECS, Canard has directly competed with it since. ECS does not have direct proof, but infers from the chain of events that Millard provided confidential ECS pricing and other data to ECS's competitor, Hollingshead Interna-

tional, in bidding for TCAS contracts with Saudi Arabian Airlines (Saudia) and Aero-Mexico. ECS does have direct evidence that Canard has offered engineering services to Key Air, Sun Country Airlines, Bendix/King, Collins, and Honeywell, all, according to ECS, in competition with ECS. For example, Millard solicited his and Sindelar's engineering services to Key Air in November 1991, but Key Air was apparently unaware that Millard and Sindelar were no longer working for ECS.

Millard states that he has never had any ownership interest in, employment relation to, nor received compensation from NAAE, thus there was no conflict of interest in contracting with Sindelar/NAAE while at ECS. He did no planning for Canard while still employed by ECS, nor did he discuss Canard with Sindelar while still at ECS. Canard provides only engineering services, not hardware, and thus does not compete with ECS. Neither he nor Canard has provided any information to Hollingsead[3] regarding Saudia or AeroMexico, nor any confidential or proprietary information regarding ECS to Hollingsead or any other competitor of ECS. Canard provides only engineering services to Sun Country Airlines, not hardware. As to Key Air, Millard states that it is not a long-standing customer of ECS and that it merely wanted to continue with himself and Sindelar for further work in November 1991. Millard does not dispute that he has contacted Bendix/King, Collins, and Honeywell, TCAS suppliers, regarding services available from Canard.

## II.

■ ECS argues that, under the four factors of *Dataphase Systems, Inc. v. CL Systems, Inc.*, 640 F.2d 109 (8th Cir.1981), it is entitled to a preliminary injunction restraining Millard from competing with it. First, ECS contends that it faces irreparable harm without an injunction. Courts infer irreparable harm upon the breach of a non-competition covenant where confidential information is involved. Millard has breached this covenant by offering compet-

ing engineering services, giving him an unfair advantage based on the knowledge he acquired at ECS. He has contacted customers he knew while at ECS. ECS is irreparably harmed by the resulting loss of good will and misuse of confidential information. This loss cannot be calculated in monetary amounts. In addition, Millard is undergoing financial difficulties and may prove unable to cover a potential damage award.

Second, ECS argues that a preliminary injunction would cause little or no hardship to Millard since he is highly qualified and experienced in the telecommunications industry, where he was employed for 18 years before coming to ECS. He remains able to generate a livelihood in fields which do not compete with ECS.

Third, ECS contends that it is likely to succeed on the merits of its counterclaim. Reasonable non-compete clauses are routinely upheld in Minnesota law. The present clause is reasonable because it furthers the legitimate interest of ECS in protecting its development of aviation engineering services and TCAS-related products, an interest with which Millard was closely associated. It is supported by ample consideration; although not entered until the week Millard began employment, it is supported by independent consideration including the economic and professional benefits Millard received through training and experience at ECS (like higher salaries and increasing responsibilities). It is reasonable in scope, with a one-year duration and geographically limited to the United States.

Finally, ECS argues that the public interest would be better served by protecting the interests of ECS, which provides an important component of a product devoted to public safety and required by a public agency.

Millard responds that a preliminary injunction would not be appropriate under the *Dataphase* analysis, and requests that the motion be denied, or in the alternative,

---

**3.** The parties disagree on the spelling of "Holl-  ingshead" or "Hollingsead."

that further discovery be allowed before decision.

Millard argues that ECS has failed to show irreparable harm, since it waited months before bringing this motion despite earlier knowledge of his activities. In addition, there can be no irreparable harm when the non-competition covenant is invalid and has not been breached, as he contends is the case here.

Millard contends that his financial hardships tilt the balance of harms against granting the injunction. ECS has provided no evidence of the availability of positions in telecommunications, particularly in light of recent massive layoffs at AT & T, IBM, and elsewhere. ECS's own argument that Millard may prove judgment-proof supports his position that it would be a great burden to close down his new business.

Millard argues that ECS is not likely to succeed on the merits. The covenant not to compete is unenforceable because it constituted overreaching by a contracting party in an unfairly superior bargaining position. He had already left his job at Honeywell and begun at ECS when presented with the covenant. It was not discussed during negotiations with ECS. It was not supported by additional consideration; ECS has made no showing that the benefits Millard received during employment would not have been received absent signing the covenant. It is also not enforceable because of Millard's wrongful discharge and the withholding of funds due him from ECS, as alleged in his complaint. And it is overbroad, not in duration or geographical restraints, but in the nature and extent of ECS's business which it attempts to protect. It extends to engaging in any business or performing any service which directly or indirectly competes with ECS, or having any interest in any enterprise so engaged. Minnesota law prohibits such broad restrictions on trade. Millard also argues that ECS will not succeed on the merits because the covenant was not in fact breached. He has only engaged in engineering services which do not compete with ECS, and does not sell the type of hardware provided by ECS.

Finally, Millard argues that the public interest in aviation safety would not be diminished by denying the injunction, and that there is a great public interest in preventing employers from denying wrongfully discharged employees their livelihood.

ECS replies that it did not unreasonably delay bringing this motion; it filed the motion within weeks of discovering Millard's competitive activities. ECS also contends that it is in the business of providing engineering services and hired Flores to do so under Millard's supervision; thus Millard is competing directly with ECS in violation of a valid non-compete covenant.

Millard argues by way of surreply that ECS has offered engineering services only since May 1991 at the earliest, two months before his discharge, and that this is too short a time period to have developed any goodwill. He contends that ECS has only actually provided engineering services after his discharge, and that certain of these were provided free of charge (to Saudia). In any case these services involve only about $145,000 in income to ECS, an insignificant 1.8% of its 1991 revenues. Millard states that Flores was hired to provide product support for ECS customers, not engineering services. He also continues to argue that the covenant is invalid and that he would be harmed more than ECS by an injunction.

### III.

In ruling upon a motion for preliminary injunctive relief, the court should consider the probability that the movant will succeed on the merits; the threat of irreparable harm to the movant; the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; and the public interest. *Dataphase Systems, supra,* 640 F.2d at 114. Given the equitable nature of the proceeding, the court's approach should be flexible to encompass the particular circumstances of each case. *Id.* at 113. In this diversity action, Minnesota law governs the merits.

Two *Dataphase* factors are intertwined here: the probability of success on

the merits and the threat of irreparable harm. This is due to the nature of the relief sought for breach of an employment agreement not to compete. Under Minnesota law,

> [i]rreparable injury can be inferred from the breach of a restrictive covenant if the former employee came into contact with the employer's customers in a way which obtains a personal hold on the good will of the business.... However, the inference may be rebutted by evidence that the former employee has no hold on the good will of the business or its clientele.

*Webb Publishing Co. v. Fosshage*, 426 N.W.2d 445, 448 (Minn.Ct.App.1988) (cites omitted); *see also Thermorama, Inc. v. Buckwold*, 267 Minn. 551, 125 N.W.2d 844, 845 (1964) (systematic solicitation of former employer's customers supports inference of irreparable harm). Thus the inquiry focuses on whether the non-compete covenant was valid, whether it was breached, and whether Millard had a hold on the good will of ECS or its clientele.

It appears from the state of the record at this time that Millard breached a valid covenant not to compete and that he did have a hold on the good will of ECS and its customers. It is undisputed that Millard entered the employment agreement, including the covenant, shortly after he had begun his work at ECS. He went over the agreement paragraph by paragraph with Smyczek, placing his "OK" next to each paragraph, including the covenant not to compete. Millard continued to work for ECS after seeing and agreeing to the covenant. He thereafter received valuable training from ECS, as well as economic and professional benefits. ECS states that it would not have employed Millard but for his agreement to the noncompete covenant. Under these circumstances, it appears that the covenant was supported by independent consideration and should be upheld at this time.[4] To the extent that its language may be overbroad in scope, ECS has set forth the more limited parameters which it would enforce. These parameters appear to be reasonable in duration, geographic range, and types of activity prohibited.

Millard initially argued that the engineering services Canard provides are of a different type than the product support services provided by ECS. In his surreply, however, he contends that even if the services offered are essentially the same, ECS has only been offering these services since May 1991 and cannot have established good will to be abrogated.

On the present record, it appears that ECS hired Miguel Flores to provide the kind of engineering services now offered by Canard, a significant investment by ECS (with the approval of Millard at the time) which created good will among the customers of ECS. Flores was involved with ECS's provision of engineering services in the Pemco contract, although Millard later struck engineering services from this contract because he said Flores was in danger of overcommitting his time. Flores was also recommended for engineering services to Key Air, a recommendation rejected by Millard because Flores was, he stated, too busy. It is significant that Millard did not withdraw Flores' engineering services from these contracts because Flores was unqualified or unable to provide such services, but out of concern for Flores' schedule. Engineering services were subsequently offered by ECS to Saudia and others. The record shows that these were the same kind of engineering services now offered by Canard, involving the preparation of an Engineering Order ("E.O.") as the first stage in the installation of TCAS. It does not appear that Flores was involved only in providing product support, of a different type

---

4. Millard also contends that the covenant should not be enforced because he has been wrongfully discharged. He bases this argument either on the principle of "unclean hands" in equity, or that one party's breach entitles the other party to rescind the entire contract. *See Hruska v. Chandler Associates, Inc.*, 372 N.W.2d 709, 715 (Minn.1985). Since Millard is seeking damages for breach of contract, not recission, the second approach does not apply here. As to unclean hands, it does not appear on the present record that ECS has committed "unconscionable" misconduct such as to deny preliminary injunctive relief on that basis alone. *Id.* Millard remains free to proceed with his claim for breach of contract.

from the engineering services offered by Canard, as Millard contends.

The FAA requirement that TCAS be installed by a certain date created a narrow and unique window of opportunity for ECS, an opportunity it actively exploited through the work of Millard, Flores, and others. Aviation-related sales at ECS grew rapidly. Millard's work was an important part of this growth, but the contracts were offered not in his name but in the name of ECS. For Millard now to offer competing services in the name of his own company to ECS customers (including Bendix/King, Collins, and Honeywell, TCAS suppliers, as well as particular airlines), appears to trade on the knowledge he acquired at ECS and the good will of ECS in the industry. This is highlighted by his contacts with Key Air. The original contract for engineering services at Key Air was entered by ECS, albeit the services were provided by Sindelar as an independent contractor with ECS. When Millard and Sindelar approached Key Air in November 1991 concerning additional engineering services, Key Air was not aware that they had left ECS and were now offering their services as a competing business. Under these circumstances, it appears that Millard is trading on the personal hold on the good will of ECS which he acquired while at ECS, in violation of his covenant not to compete and to the detriment of ECS.[5] *See Medtronic, Inc. v. Gibbons*, 527 F.Supp. 1085, 1091 (D.Minn.1981), *aff'd* 684 F.2d 565 (8th Cir.1982) (preliminary injunction granted restraining former sales representative closely identified with manufacturer).

Millard's argument that ECS unreasonably delayed bringing the present motion, showing that there could be no irreparable harm, is without merit. ECS waited only until it had sufficient facts to support its position, and then promptly scheduled a hearing on the motion. The court recognizes that it is more efficient for the parties and the court for such a motion to be brought when the record is sufficient to make a decision.[6]

The other two *Dataphase* factors incline toward granting a preliminary injunction. The balance of harms tilts toward ECS because of the threat posed to its aviation business during the limited window of opportunity provided by the FAA regulations. Millard's competitive activities pose a threat to ECS in this intense and constricted market which is difficult to calculate in monetary terms. Millard has chosen to concentrate his post-ECS employment efforts in the very field which competes with his former employer. Granting the preliminary injunction will no doubt restrict his activities in the short term; however, an employee should not be able to avoid a preliminary injunction by focusing his livelihood on the competitive conduct prohibited by the covenant not to compete. The record shows Millard to be an individual of recognized skills in sales and management, not only during his employment at ECS but also during his longer tenure at Honeywell prior to coming to ECS. Whether or not he ultimately prevails on his claims against ECS, his demonstrated abilities in areas outside the scope of the non-compete covenant should not leave him destitute.

Finally, the public interest is served by upholding valid restrictive covenants. Restraining unfair competition does not violate public policy. *See Olin Water Services v. Midland Research Laboratories, Inc.*, 596 F.Supp. 412, 415 (E.D.Ark.1984), *appeal dismissed*, 774 F.2d 303 (8th Cir.1985).

**5.** The present record is insufficient to determine whether Millard provided any confidential information regarding ECS to Hollingshead. The facts shown by ECS support an inference of such provision, but Millard denies this and ECS does not have any direct evidence to support its version. The record is also not clear whether Millard allowed Sindelar unauthorized access to confidential ECS information stored on the computer he was using. On this record, the court determines that a preliminary injunction should not be entered concerning Millard's Patent and Proprietary Information Agreement with ECS, as requested by ECS. It appears that this Agreement is valid and binding, but it has not been shown that it has been breached.

**6.** Millard's request for further discovery before the court rules should be denied because the parties have had adequate opportunity to submit materials under the circumstances.

For all these reasons, the court concludes that a preliminary injunction should be granted. The proposed order submitted by ECS is overbroad in some respects and has been revised not to extend beyond the language of the actual non-compete covenant. The parties have not suggested the amount of the bond to be posted by ECS; under all the circumstances a bond in the amount of $20,000 would appear to be appropriate.

### ORDER

Accordingly, based upon the above, and all the files, records, and proceedings herein, IT IS HEREBY ORDERED that:

1. Plaintiff and counterclaim defendant Timothy P. Millard is enjoined from violating his Employment Agreement with Electronic Cable Specialists and Electrical Conservation Systems, Inc. (ECS), and is hereby directed to cease any and all activities within the continental United States that constitute engaging in any business or performing any service, directly or indirectly, that is in competition with the business of ECS, including but not limited to providing hardware and other equipment of the type provided by ECS as well as engineering services of the type provided or offered to be provided by ECS.

2. Timothy Millard is directed to remove himself from any interest that he has and avoid subsequently acquiring an interest in any enterprise located within the continental United States, which is engaged in competition with ECS in any manner included in paragraph 1, whether that interest is as a proprietor, partner, employee, stockholder, principal, agent, consultant, director, officer or in any other capacity whatsoever.

3. This preliminary injunction shall be effective upon the posting of a $20,000 bond by ECS, and stay in effect until a decision is rendered after a trial on the merits or until August 30, 1992, whichever is sooner.

### ORDER MODIFYING PRELIMINARY INJUNCTION

On January 27, 1992, the court entered a preliminary injunction restraining plaintiff Millard from certain activities. Now before the court is the motion by Millard for reconsideration, or in the alternative to clarify the order, modify the bond, stay the injunction pending appeal, and/or expedite trial.

Millard argues that the injunction should be vacated because it was based on a misreading of the relevant law. In the alternative, he argues that the order should be clarified. He contends that: (1) he only should be enjoined from dealing with Electronic Cable Specialists (ECS) customers with whom he had significant contact while still at ECS; (2) he only should be enjoined from dealing with the one ECS customer who was expressly found to have been solicited in violation of his contract, Key Air; (3) his "engineering services" should be limited only with regard to avionics TCAS engineering services actually provided or offered by ECS during his employment with ECS; (4) the term "indirectly" is ambiguous; (5) the order should expire July 24, 1992 instead of August 30, 1992.[1] Millard also argues that the bond should be increased from $20,000 to $1,000,000 to protect him from injury should he be wrongfully enjoined.[2] He contends that the need to resolve vital questions of law and ECS's failure to pay him monies he seeks in his complaint support his motion for a stay of

---

**1.** Millard also requests clarification on points which ECS does not dispute. These should be noted and permitted under the injunction. Millard may: (1) maintain an office within the continental United States, including taking phone calls and conducting administrative activities, as long as he deals with international customers; (2) serve customers outside the continental United States; and (3) be employed by a subsidiary or division of a company that may have other subsidiaries or divisions that compete with ECS as long as he is not involved with those other subsidiaries or divisions.

**2.** Millard requests an evidentiary hearing on the amount of the bond. The court has carefully reviewed the materials submitted by the parties and determines that an evidentiary hearing is not necessary.

injunction pending appeal. Finally, he argues that the burdens imposed by the injunction support his request for an expedited trial schedule.

ECS responds that the prior order should not be vacated and does not need to be clarified except to be extended to expire on January 27, 1993. ECS contends that it would be inequitable and would eviscerate the injunction to limit it to Key Air. In the alternative, should the court find it necessary to revise the injunction, ECS argues that the injunction be clarified to state that: (1) Millard may not contract with or engage in any cooperative activities with a competitor, vendor, or customer of ECS that is located in the continental United States, even if those activities were focused on providing engineering services to a carrier that does not fly here; (2) Millard may not solicit or service any customer or potential customer of ECS that flies into the continental United States, even if that customer were based outside; and (3) "engineering services" includes Windshear, Satcom, and similar services as well as TCAS services. ECS also argues that it will suffer further irreparable loss if a stay pending appeal is granted. It contends that the bond amount was properly set and no increase is warranted. It argues that the trial need not be expedited to be scheduled before the current January 1, 1993 ready for trial date. Finally, ECS contends that the injunction should be extended to expire on January 27, 1993 based on the language of its contract with Millard.

Millard replies that ECS's suggested modifications underscore the need for clarification since the parties cannot agree on the parameters of the injunction. He notes in particular that ECS would expand the injunction to include its potential customers and vendors, to cover engineering services done completely outside the continental United States so long as the entity serviced flew into United States airspace or had an office here, and to cover non-TCAS engineering services.

Millard has presented no new legal arguments, evidence, or case citations which he could not have presented in his prior brief-

ing on the motion for a preliminary injunction. He has not shown that the order of January 27, 1992 was in error and his motion for reconsideration vacating the order should be denied.

It is apparent that the parties are confused concerning the meaning and extent of the preliminary injunction. This is ironic, since the injunction essentially tracks the language of the covenant not to compete to which they both agreed. Under the circumstances, however, the court should respond to the confusion in order to provide the kind of direction to the parties contemplated by Fed.R.Civ.P. 65(d). *See Movie Systems, Inc. v. MAD Minneapolis Audio Distributors,* 717 F.2d 427, 430 (8th Cir. 1983).

Although the language of the order states that Millard shall cease "all activities within the continental United States" that unfairly compete with ECS, it appears that the parties are not concerned about the location where Millard performs his activities but about the location of the entities whom he serves and where they fly. The order should be clarified to state that he shall not unfairly compete with respect to entities whose main headquarters are outside the continental United States (which by definition does not include Alaska or Hawaii), regardless of where they fly.

The purpose of the order is to restrain Millard from unfairly competing with ECS based on the knowledge and goodwill of ECS customers or potential customers which he acquired while employed by ECS. The order should be clarified to restrain Millard from engaging in any business with or performing any service which would compete with the business of ECS with respect to any entity which was an actual customer of ECS during the time of Millard's employment there or which was solicited for business by ECS during that time. Evidence has been submitted by ECS with respect to six such entities; these are obviously included but the order should not be limited to these should there be others which meet the above criteria.

Millard's request that the order be limited to his provision of TCAS engineering

services should be similarly construed. The order does not specify what kind of engineering services are covered, nor should it; the purpose is to limit Millard from unfairly competing based on his activities while at ECS and the order should cover any engineering services with which he was involved then.

Millard has not shown how the term "indirectly" in the order is ambiguous, and this need not be clarified.

ECS has not shown how Millard's activities with respect to vendors should be covered by the order, and this need not be clarified.

The court has reviewed the language of the parties' contract in light of the relevant circumstances, and determines that the expiration date for the injunction should not be changed.

Millard has not presented sufficient grounds for increasing the amount of the bond posted by ECS, and his request for an increase should be denied.

A party seeking a stay of a preliminary injunction pending appeal must show (1) that it is likely to succeed on the merits; (2) that it will suffer irreparable injury unless the stay is granted; (3) that no substantial harm will come to other interested parties; and (4) that the stay will do no harm to the public interest. *James River Flood Control Ass'n v. Watt,* 680 F.2d 543, 544 (8th Cir.1982) (per curiam). In the present case, where time is of the essence and ECS has already shown the narrow window of opportunity which it has to market its engineering services, Millard has failed to show that no substantial harm will come to ECS by granting a stay. He has also not shown the other *James River* factors. His motion for a stay should be denied.

Millard requests an expedited trial, citing an opinion of the Minnesota Court of Appeals which recommends that the trial court consider expediting trial pursuant to Minnesota Rules of Civil Procedure. *Webb Publishing Co. v. Fosshage,* 426 N.W.2d 445, 450 (Minn.Ct.App.1988). The equivalent federal rule is Fed.R.Civ.P. 65(a)(2). This rule provides for consolidation of the hearing of an application for a preliminary injunction with the trial of the action on the merits. It does not directly provide for an expedited trial. Under all the circumstances, with a ready for trial date currently set for January 1, 1993, the court determines that Millard's request should be denied. The case schedule provides for prompt discovery and the parties are encouraged to cooperate in discovery so that the ready for trial date may be met.

## ORDER

Accordingly, based upon the above, and all the files, records, and proceedings herein, IT IS HEREBY ORDERED that:

1. Plaintiff's motion to reconsider the order of January 27, 1992 and vacate the preliminary injunction is denied;

2. Plaintiff's motion to modify the order of January 27, 1992 to clarify the preliminary injunction is granted in part and denied in part; the order shall state: "Plaintiff and counterclaim defendant Timothy P. Millard is enjoined from violating his Employment Agreement with Electronic Cable Specialists and Electrical Conservation Systems, Inc. (ECS), and is hereby directed to cease any and all activities, with respect to entities whose main headquarters are outside the continental United States (which by definition does not include Alaska or Hawaii) regardless of where they fly, that constitute engaging in any business or performing any service, directly or indirectly, that is in competition with the business of ECS with respect to any entity which was an actual customer of ECS during the time of plaintiff's employment there or which was solicited for business by ECS during that time, including but not limited to providing hardware and other equipment of the type provided by ECS as well as engineering services of the type provided or offered to be provided by ECS."

3. Plaintiff's motion to modify the bond is denied;

4. Plaintiff's motion for a stay of the preliminary injunction pending appeal is denied;

5. Plaintiff's request for an expedited trial schedule is denied.

## SECOND ORDER MODIFYING PRELIMINARY INJUNCTION

On January 27, 1992, the court entered a preliminary injunction restraining plaintiff Millard from certain activities. On March 9, 1992, the court entered an order modifying the preliminary injunction upon motion by plaintiff. Plaintiff has written to the court requesting a change in the wording of the injunction as modified. He argues that the phrase, "outside the continental United States" on page 865, col. 2, lines 29, 30 and page 866, col. 2, 21st and 22nd lines from the bottom, should read "within the continental United States." He contends that this would make more grammatical sense. It would also fit with the purpose of the order; without the change, the injunction is, in effect, global, which is broader than the language of the non-compete covenant and the original order.

Defendant has written in opposition to the proposed change. It contends that the injunction should be global since Millard's contacts while employed by ECS were global. It argues that the original injunction, which covered entities within the United States, remains in effect and that the modified injunction simply extends the scope to cover entities outside the United States.

The court has carefully reviewed the language of the original and modified injunctions, and determines that plaintiff is correct that the language should be changed to state "within" instead of "outside" the continental United States. This was an inadvertent mistake and only by making the change can the injunction make sense. The logic can be seen by defendant's argument that the original injunction must still be in effect in addition to the modified injunction—because the modified injunction actually covers *only* entities outside the United States, a result which was not intended in the parties' non-compete covenant, and which would be unreasonable and inequitable and would not accord with the purpose of the injunction. Contrary to defendant's argument the modified injunction supplanted the original injunction; thus it would have precisely this converse effect of covering the world while excluding the United States. The change plaintiff requests should be made. This change does exclude Saudia Airlines from the scope of the injunction.

## ORDER

Accordingly, based upon the above, and all the files, records, and proceedings herein, IT IS HEREBY ORDERED that plaintiff's request to modify the order of March 10, 1992, to clarify the preliminary injunction is granted; the order shall state:

Plaintiff and counterclaim defendant Timothy P. Millard is enjoined from violating his Employment Agreement with Electronic Cable Specialists and Electrical Conservation Systems, Inc. (ECS), and is hereby directed to cease any and all activities, with respect to entities whose main headquarters are within the continental United States (which by definition does not include Alaska or Hawaii) regardless of where they fly, that constitute engaging in any business or performing any service, directly or indirectly, that is in competition with the business of ECS with respect to any entity which was an actual customer of ECS during the time of plaintiff's employment there or which was solicited for business by ECS during that time, including but not limited to providing hardware and other equipment of the type provided by ECS as well as engineering services of the type provided or offered to be provided by ECS.