REG SENECA, LLC, Plaintiff,

v.

**Phillip HARDEN, Defendant.**

**No. 4:13–cv–00121–JAJ.**

United States District Court,
S.D. Iowa,
Central Division.

April 9, 2013.

Randall D. Armentrout, Thomas M. Cunningham, Nyemaster Goode PC, Des Moines, IA, for Plaintiff.

## ORDER

JOHN A. JARVEY, District Judge.

This matter comes before the court pursuant to plaintiff's March 15, 2013 Motion for Preliminary Injunction. [Dkt. No. 4] The court held a hearing on this motion on April 1, 2013 at which the plaintiff was represented by Randall Armentrout, Thomas Cunningham and Ryan Leemkuil. The defendant was represented by Gene LaSuer and Deborah Tharnish. Plaintiff's application for a preliminary injunction is granted.

### I. NATURE OF THE ACTION

The plaintiff is the nation's largest producer of biodiesel. The defendant was an employee of the plaintiff until his resignation on March 12, 2013. Plaintiff brings this action to enforce employment agreements and enjoin the defendant from working in the biodiesel industry for two years. The defendant contends that the restrictions on his employment are unreasonable, that the plaintiff cannot demonstrate irreparable harm and that the bal-

ance of harms suggests that a preliminary injunction should not issue. The court makes the following findings of fact and conclusions of law.

## II. FINDINGS OF FACT

The plaintiff REG (Renewable Energy Group) is the nation's largest producer of biodiesel. Among other plants, it operates a facility in Seneca, Illinois, capable of producing sixty million gallons of biodiesel per year from three production lines called "trains". Defendant Phillip Harden worked at the Seneca plant for several years as one of four "lead operators". A lead operator is in charge of plant operations on any given shift. Prior to working for the plaintiff, Mr. Harden worked for Scott Petroleum, another biodiesel manufacturer, in Harden's hometown of Greenville, Mississippi. By all accounts, Mr. Harden is a gifted and valuable employee.

Over the past six months, Mr. Harden came under increasing family pressure to return to his hometown in Mississippi. He attempted to secure a transfer to an REG plant closer to Greenville without success. Upon securing the position of assistant plant manager with Scott Petroleum, Harden resigned his employment with REG on March 12, 2013. Management at REG attempted to get Mr. Harden to stay with REG. He was placed on paid administrative leave. Shortly thereafter, REG brought this action to enjoin Harden from working for Scott Petroleum. REG then offered employment closer to Harden's hometown.

### A. Production of Biodiesel

The REG Seneca plant, Scott Petroleum's Greenville, Mississippi plant, and an unrelated plant in Wisconsin are all very similar. Each was built by Nova Bio-Source. The plants at Seneca and Greenville have experienced similar difficulties in achieving production approaching the stated capacity of the plant.

The process for manufacturing biodiesel is conceptually simple but in practice it is technically difficult. The process of transesterification reacts a fat such as soybean oil with alcohol (methanol or ethanol) to produce biodiesel and glycerol. Among many variables, time, temperature, and pressure are important to the reaction. The transesterification process at REG Seneca has been under intense scrutiny for years. Mr. Harden has been an integral part of those efforts since they began. REG has spent approximately $10 million improving its process for producing biodiesel since that plant was purchased out of a bankruptcy.

REG is a very sophisticated producer of biodiesel. While some producers use soybean oil as the exclusive "feedstock" for manufacturing biodiesel, REG uses a wide variety of fats such as used oils from fast food restaurants, yellow grease and beef tallow. The use of non-virgin oil presents unique challenges for the production of biodiesel. While much has been written about the process of making biodiesel, the record is very clear here that REG Seneca's success is attributable to knowledgeable people and a lot of trial and error.

Scott Petroleum is a biodiesel manufacturer that began its operations as an outgrowth of its business delivering diesel fuel to farmers. Farm clients requested that Scott begin manufacturing biodiesel and Scott became interested in producing approximately 10 million gallons of biodiesel per year. Scott was convinced by a partner to double that capacity but that partner abandoned the project for financial reasons. The Scott plant has a 20 million gallon per year capacity but operates at a capacity of approximately 11 million gallons per year. Scott has hired consultants in an effort to increase efficiency. Despite the assistance of these consultants, it is

only recently beginning to experience an increase in efficiency.

Scott's 11 million gallons of biodiesel are sold in two ways. First, Scott blends biodiesel with diesel fuel and it delivers 7 million gallons per year to farm customers in the Mississippi Delta region of northwest Mississippi, northeast Louisiana and southern Arkansas. Second, approximately 4 million gallons of biodiesel is sold on the open market to distributers. Thus, the extent of head-to-head competition for biodiesel sales in Mississippi between the plaintiff and Scott is very small.

Scott Petroleum and REG also compete very indirectly. Both receive renewable identification numbers (RINs) for the production of biodiesel. Although the testimony was somewhat unclear on this issue, REG and Solon Scott agreed that the manufacturer receives 1.5 RINs for every qualifying gallon of biodiesel. The Environmental Protection Agency sets annual quotas dictating how much biofuel must be blended with fossil fuel. Parties obligated to meet such quotas, such as gasoline producers, must submit RINs to the EPA to demonstrate compliance. RINs can be purchased from biofuel manufacturers. Both REG and Scott sell RINs.

REG is proud of the fact that it has used innovation to enable the plant to manufacture 100% of its biodiesel capacity despite the fact that others, such as Scott, produce at approximately 55% capacity. Because of the similarities between the REG Seneca and Scott Petroleum plants and because of Mr. Harden's consistent and important role in developing REG's superior process, it is inevitable that Mr. Harden will be able to and will use the knowledge that he has gained with the plaintiff if he is permitted to work for Scott Petroleum.

### B. Non–Compete and Confidentiality Agreement

REG goes to great lengths to protect information that it believes to be proprie-tary, confidential, or trade secrets. Its employee handbook has strong language concerning confidentiality which Mr. Harden acknowledged and agreed to upon commencement of his employment in June 2010. [Ex. 1]

On May 20, 2010 Phillip Harden signed an Employee Agreement with REG Seneca. In it, he agreed to the following:

1. *Covenant Not To Compete.* Employee shall not, during Employee's employment with the Company and for twenty-four (24) months thereafter, without the prior written consent of the Company, directly or indirectly, own, manage, operate, control be employed by, participate in, advise or be connected in any manner with the ownership, management, operation or control of, any entity or entities engaged in the Biodiesel Business. The covenants of Employee contained in this paragraph 1 shall apply to the United States of America, which Employee represents and warrants is the minimum geographical area in which the REG Affiliated Group is presently operating and intending to operate.

He signed another agreement on April 17, 2012, in exchange for employee stock options. [Ex. 5] This time, the covenant not to compete was stated more broadly. It provides:

1. *Covenant Not To Compete.* Employee shall not, during Employee's employment with the Company and for twenty-four (24) months thereafter, without the prior written consent of the Company, directly or indirectly, own (other than passive investments in publicly traded companies where such investment does not exceed more than one percent (1%) of the total outstanding shares

or other equity interests of such company), manage, operate, control, be employed by, participate in, advise or be connected in any manner with the ownership, management, operation or control of, any entity or entities engaged in the Biofuels/Renewable Chemicals Business or any other business related thereto or related to any special project or initiative the Company may have pursued during Employee's employment with the Company. The covenants of Employee contained in this paragraph 1 shall apply to each State and Country in which the Company, either directly or indirectly through Employer or an Affiliate of Employer, conducted its business or otherwise offered any goods, products or services related to its business, which shall include all States in the United States of America, which Employee represents and warrants is the minimum geographical area in which the Company is presently operating and intending to operate.

### III. CONCLUSIONS OF LAW

■ The movant has the burden of "establishing the propriety" of preliminary injunctive relief. *Baker Elec. Co-op., Inc. v. Chaske,* 28 F.3d 1466, 1472 (8th Cir. 1994) (citing *Modern Computer Sys., Inc. v. Modern Banking Sys., Inc.,* 871 F.2d 734, 737 (8th Cir.1989) (en banc)). In evaluating REG's motion, the Court considers the familiar *Dataphase* factors, which are: (1) movant's probability of success on the merits; (2) the threat of irreparable harm to plaintiff; (3) the balance between this harm and potential harm to others if relief is granted; and (4) whether an injunction serves the public interest. *Dataphase Sys., Inc. v. C L Sys., Inc.,* 640 F.2d 109, 114 (8th Cir.1981) (en banc). "A court should balance these considerations when deciding whether to issue an injunction." *Mid–America Real Estate Co. v. Iowa Realty Co., Inc.,* 406 F.3d 969, 972 (8th Cir. 2005) (citing *Taylor Corp. v. Four Seasons Greetings, LLC,* 315 F.3d 1039, 1041 (8th Cir.2003)).

### A. Likelihood of Success on Merits

■ Although no single factor is dispositive, *Lankford v. Sherman,* 451 F.3d 496, 503 (8th Cir.2006), the first factor—the movant's likelihood of success on the merits—is the most significant. *S & M Constructors, Inc. v. Foley Co.,* 959 F.2d 97, 98 (8th Cir.1992), *cert. denied,* 506 U.S. 863, 113 S.Ct. 184, 121 L.Ed.2d 129 (1992). Under this factor, the Court need not decide whether the movant will ultimately prevail but only whether it has a "fair chance of prevailing" on the merits. *Planned Parenthood Minnesota, North Dakota, South Dakota v. Rounds,* 530 F.3d 724, 732 (8th Cir.2008); *See O'Connor v. Peru State College,* 728 F.2d 1001, 1002 (8th Cir.1984) ("the court should avoid deciding with any degree of certainty who will succeed or not succeed.")

In order for there to be a likelihood of success on the merits, REG's complaint must, at the very least, be grounded in good law. *Uncle B's Bakery, Inc. v. O'Rourke,* 920 F.Supp. 1405, 1424 (Iowa N.D.1996) ("In order to weigh in the movant's favor, the movant's success on the merits must be at least sufficiently likely to support the kind of relief it requests. Thus, likelihood of success on the merits requires that the movant find support for its position in governing law.") (citations omitted). REG's complaint charges Harden with breach of contract (Count I), misappropriation of trade secrets (Count II) and breach of fiduciary duties (Count III). [Dkt. No. 2 at 6.] Count I addresses Harden's alleged breach of the non-compete portion of the agreement between

REG and Harden, whereas Counts II and III address REG's concerns about the dissemination of its trade secrets. In this diversity action, the substantive law governing the REG's claims is Iowa law.

### 1. Iowa Trade Secrets Law

■ The protection of trade secrets is a matter of Iowa statutory and common law. *See 205 Corp. v. Brandow,* 517 N.W.2d 548, 551 (Iowa 1994) (holding that the Iowa Uniform Trade Secrets Act did not preempt all tort theories of recovery and allowing claims of both misappropriation of trade secrets and breach of duty not to disclose confidential information). Claims under both statutory and common law are addressed by Counts II and III.

The Iowa Uniform Trade Secrets Act provides that "[t]he owner of a trade secret may petition the district court to enjoin an actual or threatened misappropriation." Iowa Code § 550.3(1). Iowa Code section 550.2(4) defines a trade secret as:

[I]nformation, including but not limited to a formula, pattern, compilation, program, device, method, technique, or process that is both of the following:

a. Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by a person able to obtain economic value from its disclosure or use.

b. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

*Iowa Code § 550.2* (4). Iowa Code section 550.2(3)(b) defines misappropriation as "disclosure or use of a trade secret by a person who uses improper means to acquire the trade secret." "Improper means" is defined as "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage, including but not limited to espionage through an electronic device." *Iowa Code § 550.2* (1). REG has been

clear that it alleges no improper conduct on the part of Harden in obtaining the confidential information, and that it is only seeking to prevent the disclosure of what it deems to be trade secrets to Harden's new employer.

■ In order to decide whether an injunction is appropriate under Iowa trade secrets law, the Court must first decide whether the information the movant seeks to protect constitutes trade secrets. The appropriate definition is that found in Iowa Code § 550.2(4). *205 Corp.,* 517 N.W.2d at 550 (holding that common-law definitions of trade secrets are inappropriate because "the words of the statute are plain and unambiguous"). Further, Iowa law gives a broad interpretation as to what constitutes trade secrets. *US West Communications, Inc. v. Office of Consumer Advocate,* 498 N.W.2d 711, 714 (Iowa 1993) ("We believe that a broad range of business data and facts which, if kept secret, provide the holder with an economic advantage over competitors or others, qualify as trade secrets"). Essentially, in order for information to be a trade secret, it must be information that is valuable to the holder because it is secret, and the holder must have made efforts to keep that information secret.

■ Here, the information REG seeks to protect—its "formulas," "recipes," and "process" for transesterfication and glycerolysis—readily fall into the categories of information contemplated in Iowa Code § 550.2(4). Harden argues that REG's transesterification and gylcerolysis processes are not trade secrets because the general methods used by the Plaintiff are available on the internet or from books. REG argues, however, that what they seek to protect is not the ability to produce biodiesel, but the exact formulas and process they have developed through years of expensive research and trial and error,

information not available to anyone except REG. This information is valuable to REG, not only in the money expended in its discovery, but because it allows REG to operate its biodiesel refinery at full capacity, an achievement which gives REG a considerable competitive advantage and one that has eluded other similarly situated biodiesel producers, such as Scott Petroleum, because that information is not known to them. Further, REG has clearly taken steps to prevent the dissemination of this information, as it requires all employees to sign confidentiality agreements and institutes suits such as this one upon facing the prospect of a breach of that agreement. As the information REG seeks to protect is both valuable to REG because it is unknown to others and REG has taken steps to keep that information secret, REG's formulas and manufacturing processes constitute trade secrets under Iowa law.

■ In order for injunctive relief to be granted, REG must show that there is a threat that its trade secrets will be "misappropriated." Iowa Code § 550.3(1). Here, "misappropriated" means the disclosure of trade secrets through "improper means," which includes a "breach of a duty to maintain secrecy." Iowa Code § 550.2(3)(b). REG has shown—to the extent necessary to find a likelihood of success on the merits—that Harden was subject to a duty not to disclose trade secrets, or any other confidential information, a duty which arises from Harden's signing of the two confidentiality agreements. As Harden is in possession of information considered to be trade secrets under Iowa law, and there is a threat of misappropriation of this information, injunctive relief preventing Harden from sharing this information with his new employer is appropriate.

## 2. Non-competition

■ In order to enjoin Harden from working with his new employer, REG must show a likelihood of success on the merits of its claim. In order to determine this likelihood, the Court must consider whether the non-competition agreement is valid and enforceable under Iowa law. *See Curtis 1000, Inc. v. Youngblade*, 878 F.Supp. 1224, 1257–72 (Iowa N.D.1995). Under Iowa law, there is a three-prong test to determine the validity of a non-compete agreement: 1) is the restriction reasonably necessary for the protection of the employer's business; 2) is the it unreasonably restrictive of the employee's rights; and 3) is it prejudicial to the public interest? *Lamp v. American Prosthetics, Inc.*, 379 N.W.2d 909, 910 (Iowa 1986).

As for the first prong, REG has shown that Harden is in possession of specific and valuable information related to the production of biodiesel. Specifically, Harden possesses extensive knowledge in the efficient production of biodiesel from diverse feedstocks, including virgin and non-virgin oil and tallow. This is a narrow niche in an already small field and makes Harden a valuable commodity to REG's competitors. Harden's employment with REG has given him "special training or peculiar knowledge that would allow him to unjustly enrich himself at the expense of his former employer." *Curtis 1000*, 878 F.Supp. at 1261 (citations omitted). Harden's value to a competitor such as Scott Petroleum is not only in the trade secrets he possesses, but in his admitted knowledge of the methods used to create those trade secrets and ability to reproduce that knowledge elsewhere. This weighs heavily in favor of REG.

As to the second prong, whether the agreement is unreasonably restrictive to the employee, the court in *Uncle B's* noted that restrictions up to five years have been

held enforceable. *Uncle B's Bakery, Inc. v. O'Rourke,* 920 F.Supp. 1405, 1433 (Iowa N.D.1996). REG's significant investment in the development of their technology weighs in favor of finding the two-year restriction not to be unreasonably restrictive. *See id.* Harden argues that the non-compete agreement, restricting him from working at any business involved in the biodiesel or renewable fuel industry in the nation, is too broad to be enforceable. A better question here, however, is whether it is over reaching to restrict Harden from working for Scott Petroleum. Harden is not seeking to work at just any biodiesel producer, but to work for one of the few plants in the country that produces biodiesel using the same methods as REG, and who would greatly benefit from the knowledge Harden learned while working for REG. As this is exactly the situation REG seeks to prevent, the non-compete agreement is not overbroad in this instance.

### B. Irreparable Harm

 Next, the movant must show that it will suffer irreparable harm absent the injunction. *Planned Parenthood Minnesota, North Dakota, South Dakota v. Rounds,* 530 F.3d 724, 732 n. 5 (8th Cir.2008). A movant may show irreparable harm by showing that there is no adequate remedy at law. *Gen. Motors Corp. v. Harry Brown's L.L.C.,* 563 F.3d 312, 319 (8th Cir.2009). Where the movant has an adequate legal remedy, a preliminary injunction will not issue. *Frank B. Hall & Co. v. Alexander & Alexander, Inc.,* 974 F.2d 1020, 1025 (8th Cir.1992).

 Here, the Employee Non–Competition and Confidentiality Agreement specifically states that the parties agree that in the event of a breach of the Agreement, "irreparable injury will result to the Company and that injunctive relief to restrain the violation of this Agreement is appropriate." [Dkt. No. 4–2 at 3.] Other courts have found a breach of an agreement such

as this to be sufficient to infer irreparable harm. *See Uncle B's,* 920 F.Supp. at 1434 ("[the plaintiff] has adequately demonstrated a threat of irreparable harm, because there is a threat of a breach of the agreement implicit in [defendant's] employment with a competitor"); *Overholt Crop Ins. Service Co. v. Travis,* 941 F.2d 1361, 1371 (8th Cir.1991) (holding that "irreparable harm 'can be inferred from a trial court's actual finding of a breach [of a restrictive covenant] by the defendant.' "); *Millard v. Electronic Cable Specialists,* 790 F.Supp. 857, 860 (D.Minn.1992) ("Courts infer irreparable harm upon the breach a non-competition covenant where confidential information is involved."). As REG has already shown a reasonable likelihood that the agreement is binding upon Harden, and Harden is breaching that agreement through employment Scott Petroleum, REG has adequately shown a threat of irreparable harm.

Harden argues that there is no real threat, as he will not reveal any of the confidential information he learned while employed with REG. REG argues that while Harden may not explicitly reveal the confidential information learned during his employ, there is a real threat of inevitable disclosure. REG was involved in a long series of trial-and-error experiments in order to develop the technology it uses today. Harden's new employer has a biodiesel plant that was constructed very similarly to REG's plant before the upgrades that brought REG's plant up to full capacity. To allow Harden's new employer to essentially skip much of the expensive, time-intensive, research process REG has already engaged in would be an irreparable harm. *See Uncle B's,* 920 F.Supp. at 1425 ("Certainly, if the disclosure allows a competitor to cut corners in the research and development process of a similar [process,] the competitor will attain a competing product that much soon-

er, and it is this harm to [the plaintiff] that is irreparable.").

The Court finds that there is sufficient threat of irreparable harm to enjoin Harden from both disclosing REG's confidential information and Harden's continued employment with Scott Petroleum. The Non–Competition and Confidentiality Agreement sufficiently embodies the parties' agreement that any disclosure of confidential information will result in irreparable harm, and the Court has found any disclosure of REG's trade secrets will result in irreparable harm. While Harden would normally be able to use the general knowledge and skills he has accumulated in the course of employment, this does not extend to the specialized knowledge and training he has acquired at the expense of REG. Harden's testimony demonstrated that he would have difficulty discerning where his general knowledge ends and REG's trade secrets begin, making the threat of inadvertent disclosure of trade secrets to his new employer very real, despite genuine assurances made by Harden or Scott Petroleum. Harden's employment with Scott Petroleum creates a threat of irreparable harm.

### C. Balance of Harms

The balance of harms analysis requires the Court to weight the harm resulting to each party from granting or denying the injunction. *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir.1981). The Court can consider harm to the litigants as well as harm to interested third parties. *Baker Elec. Co-op., Inc. v. Chaske*, 28 F.3d 1466, 1473 (8th Cir.1994). It is not the same as the "irreparable harm" analysis, as that focuses on the harm or potential harm to the plaintiff of the defendant's conduct. *Dataphase*, 640 F.2d at 114.

The harms to both parties are clear; REG seeks to avoid the disclosure of its trade secrets while Harden seeks to make a living. The Court is hesitant to enter an order that bars a person from continuing to work in the field of and with the employer of their choosing, but must conclude that the balance of harms tips in favor of REG. REG has taken great care to protect the confidential information and technology created from its significant investment by making all employees sign a non-compete and confidentiality agreement and would suffer harm from the violation of that agreement. *See Curtis 1000, Inc. v. Youngblade*, 878 F.Supp. 1224, 1274 (Iowa N.D.1995) (holding that despite employee's right to work, the balance of harms weighed in the former employer's favor to enjoin an employee from violating a non-competition clause). REG is also faced with a significant harm if its confidential information is disclosed, even inadvertently.

While Harden's current employment opportunity is at stake in this decision, it is difficult to find the balance of harms weighs in his favor when he was the person who chose to leave his employ with REG, despite warnings that doing so would violate the non-compete clause. The harm was completely foreseeable to Harden, while the harm to REG is exactly of the type it has sought to avoid through the signing of non-compete agreements. The Court has real sympathy for the situation that caused Harden to leave REG but cannot ignore that Harden took the benefit of employment with REG in exchange for signing the agreement not to compete and was reminded of that obligation before leaving REG. The balance of harms is in favor of enjoining Harden's employment with Scott Petroleum.

### C. Public Interest

Lastly, the Court considers whether the public interest would be served by granting the movant's motion for injunctive relief. *Dataphase*, 640 F.2d

at 113. In general, the enforcement of valid non-competition agreements serves the public interest. *N.I.S. Corp. v. Swindle,* 724 F.2d 707, 710 (8th Cir.1984) ("[I]f these noncompete agreements are valid, the public interest calls for their enforcement."). The Court finds this to be largely a private dispute, governed by contract law, and as such the public has little interest in the outcome of this dispute. As such, the public interest weighs little in favor of either party.

## IV. CONCLUSION

REG has successfully shown the *Dataphase* factors weigh in favor of granting a preliminary injunction enjoining Harden from working with Scott Petroleum. REG has shown that there is a sufficient likelihood of success on the merits of its claim, that there is a significant threat of irreparable harm, and that the balance of harms weighs in its favor.

Harden makes a somewhat compelling argument that his most recent non-competition agreement, which prevents him from working in any biofuels/renewable chemical industry, could be overbroad. The Court, however, is not currently concerned with that issue, as Scott Petroleum is not just a renewable chemical producer, but engages in exactly·the same business as REG. REG is clearly entitled to an injunction preventing Harden from working for Scott Petroleum. The Court retains jurisdiction to determine whether any other prospective employment violates the noncompete agreement. The Motion for Preliminary Injunction is **GRANTED**.

Upon the foregoing,

**IT IS ORDERED** that the Plaintiff's Motion for Preliminary Injunction is **GRANTED**. Defendant Harden shall not work in any capacity for Scott Petroleum for two years commencing March 13, 2013.